David J. STEINBERG, Carol Blum and David Blum, Charles M. Boyett, Richard Glotzer, G.M. and Ellen Leitenberger, Jagadish Patel, and Anthony Skettino on behalf of themselves and all others similarly situated, Plaintiffs,

v.

PRT GROUP, INC., Douglas K. Mellinger, Lowell W. Robinson, Gregory S. Mellinger, and the Mellinger Group, Defendants.

No. 98 Civ. 6550(DC).

United States District Court, S.D. New York.

March 28, 2000.

Milberg, Weiss, Bershad, Hynes & Lerach, LLP, by Robert P. Sugarman, Janine L. Pollack, Cary L. Talbot, New York, NY, Savett Frutkin Podell & Ryan, P.C., by Stuart H. Savett, Robert P. Frutkin, Barbara A. Podell, Philadelphia, PA, Bernstein Liebhard & Lifshitz, LLP, by Sandy A. Liebhard, New York, NY, for Plaintiffs.

Skadden, Arps, Slate, Meagher & Flom, LLP, by Jerome S. Hirsch, Maura B. Grinalds, William Bernarduci, New York, New York, for Defendants PRT Group, Inc., Douglas K. Mellinger, Lowell W. Robinson, and Gregory S. Mellinger.

Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., by Michael W. Mitchell, New York, NY, for Defendant the Mellinger Group.

## OPINION

CHIN, District Judge.

In this putative class action, plaintiffs allege that defendants, PRT Group, Inc. ("PRT"), an information technology ("IT") services company, and certain of its directors, officers, and shareholders, disseminated false and misleading information in the prospectus and registration statement issued in connection with a November 1997 initial public offering ("IPO"), in violation of sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77k, 77l, & 77o (1997). Plaintiffs contend that the prospectus contained false and misleading statements relating to PRT's technological capabilities, client relationships, future growth potential, recruiting and staffing abilities, and "Year 2000" ("Y2K") consulting business.

Defendants move to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), for failure to plead fraud with particularity pursuant to Fed. R.Civ.P. 9(b), and for failure to provide a "short and plain" statement of the claim, pursuant to Fed.R.Civ.P. 8.

For the reasons stated herein, the motions to dismiss are granted.

## BACKGROUND

### A. The Facts

For purposes of this motion, the facts as set forth in the amended complaint are assumed to be true. *See Luce v. Edelstein,* 802 F.2d 49, 52 (2d Cir.1986).

### 1. The Parties

PRT, a Delaware corporation, offers IT services internationally, primarily to large "Fortune 500"companies. The company maintains offices in Connecticut, Illinois, New Jersey, New York, and Virginia. (Compl.¶ 19). In addition, PRT operates software development centers ("SDCs") in Barbados, West Indies, and Hartford, Connecticut. (Def. Mem. at 4).

Defendant Douglas K. Mellinger is the Chairman of the Board, Chief Executive Officer, and President of PRT. Defendant Gregory S. Mellinger is the Chief Operating Officer and a director of PRT. Defendant Lowell W. Robinson is the Executive Vice President, Finance and Administration, and Chief Financial Officer of PRT. (Compl.¶¶ 7–9). Douglas Mellinger, Gregory Mellinger, and Robinson (collectively, the "Individual Defendants") held their positions during the relevant class period as well.

Defendant The Mellinger Group ("TMG") is wholly owned by Douglas and Gregory Mellinger and their brother Paul Mellinger. TMG sold 299,000 shares of PRT stock in the IPO, and continued to hold approximately 6.2 million shares of PRT stock after the IPO. (Compl.¶ 11).

Plaintiffs purchased PRT common stock in the November 1997 IPO. (Compl.¶ 5). Specifically, the Complaint alleges that plaintiffs purchased the Company's common stock between November 21, 1997 and March 5, 1998 "pursuant to and traceable to" the prospectus. (*Id.* ¶ 55).

### 2. PRT's Operations

PRT provides a spectrum of IT services to its clients, including (1) strategic consulting, which includes management consulting and IT planning; (2) project solutions, which includes software development, mass change renovation, and testing services; and (3) staff augmentation, which includes team or individual staffing for a range of IT services. (Def. Mem. at 4).

PRT's business operates on a proposal/bid system; PRT receives proposals from various potential clients seeking bids to perform IT services. (Compl.¶ 20). When a proposal is received, the PRT account manager responsible for that particular account prepares a bid, which consists not only of the proposed costs of the services to be rendered but also the resumes of the proposed IT personnel who would perform the work for the client. (*Id.* at ¶ 21). These IT professionals were

generally not employees of PRT, but rather were independent contractors hired by PRT for a particular assignment (*id.*); because PRT would need IT personnel for a project only if it were awarded the job, it hired IT professionals as it needed them, on a project-by-project basis. These independent contractors were subject to approval by the company seeking the IT services. (*Id.*). Thus, to prepare a bid, PRT would have to locate and assemble groups of qualified IT professionals, and identify those professionals in the bid. (*Id.*). In addition to the independent contractors it hired, PRT also employed a staff of full-time IT professionals. (Def. Mem. at 33).

While PRT often received repeat business from existing clients, each project (or even each stage of a project) usually represented a separate contractual commitment, and the client was not obligated to engage PRT again. (Def. Mem. at 10). Certain clients designated PRT as a "preferred vendor," meaning that PRT would have the ability, shared with other preferred vendor firms, to receive proposals from and bid on projects for that particular client. (Compl.¶ 20). According to plaintiffs, there could be as many as 500 preferred vendors for any given company. (*Id.*).

### 3. *The IPO and PRT's Subsequent Performance*

On or about November 21, 1997, PRT commenced an IPO of its common stock pursuant to a registration statement and prospectus, signed by all of the Individual Defendants and filed with the Securities and Exchange Commission (the "SEC"). (Compl.¶¶ 10, 23–24). The IPO was conducted through a firm commitment underwriting[1] in which the Company offered 4,600,000 shares of its stock at $13 per

share; PRT sold 3,850,000 shares itself, realizing net proceeds of more than $46 million, and certain shareholders sold 750,000 shares, realizing net proceeds of more than $9 million. (*Id.* ¶ 23). As noted above, plaintiffs purchased PRT common stock through the November 1997 IPO. (*Id.* ¶ 5).

Several months after the IPO, on February 9, 1998, PRT released its fourth quarter and 1997 year end financial results, representing that revenues for 1997 increased 151% and that the Company earned $1.1 million in the fourth quarter. (Compl.¶ 34). Less than a month later, on March 5, 1998, PRT announced that it expected to report a $3 million net loss in the first quarter of 1998, attributing the decline to customer delays in connection with Y2K projects. (*Id.* ¶ 35). Following the March 5 announcement, PRT's stock price dropped; in heavy trading, the price per share fell from a closing price of $19.125 on March 5 to a closing price of $9.5625 on March 6. (*Id.* ¶ 36). PRT continued to lose money, with net losses equaling $12 million for 1998. (*Id.* ¶ 38).

### B. *Procedural History*

Plaintiffs commenced the instant suit on September 16, 1998. By order dated December 18, 1998, I appointed certain individuals as lead plaintiffs and approved the selection of Milberg Weiss Bershad Hynes & Lerach and Savett Frutkin Podell & Ryan as lead counsel. (*See* 12/18/98 Order). No class has been certified to date.

Following a conference with the Court, plaintiffs filed an amended complaint on March 15, 1999.[2] These motions followed.

### DISCUSSION

Plaintiffs contend that the prospectus contained false and misleading statements

---

1. In a firm commitment offering, shares are sold to underwriters, which in turn resell the stock to the public. *See, e.g., Schoenhaut v. American Sensors, Inc.,* 986 F.Supp. 785, 788 n. 2 (citing Edward I. Altman, *Financial Handbook,* § 31 (5th ed.1981)).

2. At the conference, defendants notified the Court of their intent to move to dismiss the complaint. I directed defendants to submit, in letter form, a brief summary of the perceived deficiencies of the complaint to plaintiffs, and granted plaintiffs leave to replead if they chose to do so after reviewing the letter. I informed plaintiffs that I would consider the

relating to PRT's technological capabilities, client relationships, future growth potential, recruiting and staffing abilities, and Y2K business. Plaintiffs assert that these false and misleading statements render all named defendants liable for violations of §§ 11 and 12(a)(2) of the 1933 Act, *see* 15 U.S.C. §§ 77k & 77*l*, and subject the Individual Defendants and TMG to "controlling persons" liability pursuant to § 15 of the 1933 Act. *See* 15 U.S.C. § 77*o*.

Defendants' primary argument in support of their motions to dismiss is that plaintiffs have failed to identify an actionable misstatement or omission in the prospectus.[3]

### A. Motion to Dismiss Standards

In reviewing a motion to dismiss, I must accept the factual allegations contained therein as true and draw all reasonable inferences in favor of plaintiffs. *See, e.g., King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). A complaint may be dismissed under Rule 12(b)(6) " 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir. 1996) (quoting *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991)). "The task of the court in ruling on a Rule 12(b)(6) motion is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.' " *Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir.1998) (quoting *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir.1984)).

On a motion to dismiss a complaint brought under the securities laws, the Court may properly consider a document, such as the prospectus at issue here, which is incorporated by reference, even if it is not attached to the complaint. *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991); *Pincus,* 936 F.2d at 762.

### B. Securities Act of 1933

#### 1. Sections 11 and 12

Section 11 of the 1933 Act provides that any signer of a registration statement or director of the issuer may be held liable to purchasers of registered securities if any part of the registration statement contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein not misleading. *See* 15 U.S.C. § 77k(a). Section 12(a)(2) imposes liability for selling or offering a security by means of a prospectus that includes an untrue statement of material fact or omits a material fact necessary to make such statements not misleading. *See* 15 U.S.C. § 77*l* (a)(2). Thus, to state a cognizable claim under either §§ 11 or 12(a)(2) of the 1933 Act, plaintiffs must demonstrate that the prospectus[4] for PRT's November 1997 IPO

---

fact that they were given an opportunity to amend their complaint in deciding whether to allow them to replead a second time if defendants' motion to dismiss were granted.

**3.** Defendants advance three other arguments in support of their motions to dismiss. First, they contend that none of the defendants are "sellers" for purposes of § 12(a)(2). Second, defendants argue that plaintiffs' claims "sound in fraud," thus triggering the heightened pleading requirements of Fed.R.Civ.P. 9(b), and that plaintiffs' allegations fall short of the standard set forth in that rule. Third, defendants assert that the complaint should be dismissed for failing to provide a "short and plain" statement of plaintiffs' claims, as

required by Fed.R.Civ.P. 8. Because I am granting the motions on other grounds, I need not reach these issues.

**4.** As set out above, Section 11 imposes liability for false or misleading statements or omissions in a registration statement, while Section 12(a)(2) prohibits such statements or omissions in connection with a prospectus. In the instant case, plaintiffs allege only that the prospectus contained false and misleading statements, but as the registration statement incorporated the prospectus (*see* Compl. ¶ 24), if the prospectus contains any untrue statements or omissions, the registration necessarily contains those same statements. For ease of discussion, I refer only to the prospectus.

contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. *See In re Donna Karan Int'l Sec. Litigation*, No. 97 Civ. 2011(CBA), 1998 WL 637547, at *4 (E.D.N.Y. Aug. 14, 1998) ("[A] prerequisite to recovery under either § 11 or § 12(a)(2) is a misstatement or omission concerning a material fact.").

Several principles govern the analysis of plaintiffs' §§ 11 and 12 claims.

### a. *Materiality*

■ A misrepresentation of fact is material under §§ 11 and 12(a)(2) when an investor would attach importance to it in making an investment decision. *See In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145(BSJ), 1999 WL 1052004, at *9 (S.D.N.Y. Nov. 19, 1999) (citing cases); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). An omission is material if there is a substantial likelihood that the " 'disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of the information made available.' " *APAC*, 1999 WL 1052004, at *9 (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126).

■ While a court may dismiss a claim on the ground that an misstatement or omission was not material, "the standard for doing so is high: '[A] complaint may not properly be dismissed pursuant to 12(b)(6) ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.' " *Milman v. Box Hill Sys. Corp.*, 72 F.Supp.2d 220, 228 (S.D.N.Y.1999) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985) (alterations in original)).

### b. *The Prospectus*

■ In determining whether the statements contained in a prospectus are mate-

rially misleading, the prospectus must be read as a whole. *Olkey*, 98 F.3d at 5. Moreover, " 'the central issue ... is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities].' " *Id.* (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990) (alterations in original), *cert. denied*, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991)); *see also Pincus*, 936 F.2d at 761.

■ If a plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint. *See Barnum v. Millbrook Care Ltd. Partnership*, 850 F.Supp. 1227, 1232–33 (S.D.N.Y.) (citing cases), *aff'd mem.* 43 F.3d 1458 (2d Cir.1994). In such a situation, dismissal of the complaint is proper, for no additional facts can prove the claims. *See Olkey*, 98 F.3d at 9 ("[Because] the plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus, no set of additional facts could prove the plaintiffs' claims."); *Hinerfeld v. United Auto Group*, No. 97 Civ. 3533(RPP), 1998 WL 397852, at *4 (S.D.N.Y. July 15, 1998) ("If the plaintiffs' claims of misleading disclosures are contradicted by disclosures made on the face of the prospectus, then no additional facts can prove the claims and dismissal is proper."). The Second Circuit has consistently affirmed Rule 12(b)(6) dismissals of securities claims where the risks of which plaintiffs complained were disclosed in the prospectus. *Olkey*, 98 F.3d at 9 (citing cases).

### c. *Bespeaks Caution Doctrine*

■ Under the "bespeaks caution" doctrine, "a misrepresentation or nondisclosure will be deemed immaterial if surrounded by cautionary language sufficiently specific to render reliance on the misrepresentation unreasonable." *Mil-*

*man,* 72 F.Supp.2d at 230; *see Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986). This doctrine only applies to forward-looking statements, however, *see In re Nokia Sec. Litig.,* No. 96 Civ. 3752(DC), 1998 WL 150963, at *8 (S.D.N.Y. Apr. 1, 1998), and the language cited "must precisely address the substance of the specific statement or omission that is challenged." *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y. 1996). Moreover, the doctrine does not apply to misstatements or omissions concerning historical or current facts. *See APAC,* 1999 WL 1052004, at *8.

#### d.  *General Statements of Optimism*

■  Finally, under the securities laws, general statements of optimism are not actionable.  " '[F]orward-looking statements' that 'reflect hope, adequately tinged with caution,' when considered in the context of the 'total mix of information' available to the market, are not misleading." *Nokia,* 1998 WL 150963, at *6 (quoting *San Leandro Emergency Med. Plan v. Philip Morris, Co.,* 75 F.3d 801, 811 (2d Cir.1996)) (alterations in original).  Such vague expressions of optimism constitute immaterial corporate "puffery," which cannot mislead the reasonable investor. *See id.*

With these principles in mind, I turn to plaintiffs' claims.

#### 2.  *Plaintiffs' Claims*

Plaintiffs allege that defendants violated §§ 11 and 12(a)(2) by making materially false or misleading statements in connection with: (1) PRT's technological capabilities; (2) PRT's ability to obtain new business from new clients and additional business from existing clients; (3) PRT's ability to recruit and train IT professionals to staff its consulting projects and its relationship with its employees and independent IT subcontractors; (4) PRT's ability to obtain Y2K business, including its unsuccessful bids for several Y2K projects; and (5) the risk factors associated with PRT's business in general.

In response, defendants contend that the alleged material misstatements or omissions are (1) squarely refuted by the actual disclosures in the prospectus; (2) immaterial expressions of general optimism; or (3) not actionable under the "bespeaks caution" doctrine.

I address each of plaintiff's contentions in turn.

#### a.  *Technological Capabilities*

■  Plaintiffs allege that the prospectus falsely represented that "PRT has developed proprietary software tools and processes," when in fact the Company was "substantially dependent upon software, technology and expertise of other companies."  (Compl.¶ 26(b)).  For example, plaintiffs claim that PRT's "Solutions 2000" package and "Process Asset Library" ("PAL") were not "proprietary software packages" but rather "consisted primarily of software owned by [a third party] which PRT was permitted to use pursuant to a license agreement." (Compl.¶ 26(d)).  Finally, plaintiffs claim that the prospectus falsely represented that PRT offered clients "technologically advanced or competitively superior [Y2K] solutions." (*Id.*).

Defendants accurately observe that the prospectus contains repeated disclosures about PRT's reliance on third-party "software, technology, and expertise."  For example, the prospectus unambiguously stated that "the Company relies on licenses from outside parties for certain of its [Y2K] software tools." (Prospectus at 9). On the next page, in a paragraph headed "Intellectual Property," the prospectus notes that PRT's intellectual property rights include "intellectual property rights licensed from third parties." (*Id.* at 10). Moreover, in a detailed example of PRT's Y2K consulting work, the prospectus explained that PRT developed a solution for the client that "us[ed] third-party software tools coupled with a PRT[-] developed framework ... that became the Company's QA2000 methodology." (Prospectus

at 28). Therefore, to the extent that plaintiffs claim that the prospectus failed to disclose that PRT was "dependent upon software, technology, and expertise" of other companies that was "equally available to PRT's competitors" (Compl.¶ 26(b); *see also id.* ¶ 26(d)), this claim is squarely contradicted by the disclosures in the prospectus, and therefore fails as a matter of law. *See Olkey*, 98 F.3d at 9; *Hinerfeld*, 1998 WL 397852, at *4.

Similarly, plaintiffs' contention that PRT's statements about its PAL software development framework were false is also contradicted by the language of the prospectus. Contrary to plaintiffs' assertions, the prospectus revealed that PAL was based, in part, on third-party software, including the Carnegie Mellon University Software Engineering Institute Capability Maturity Model ("CMM"). (Prospectus at 25–26). PAL was described as a "software development framework based upon the CMM model" and a "knowledge *bank*[5] of software development life cycle processes, methodologies, tools, and reusable work product developed by PRT." (Prospectus at 3, 24, 26 (emphasis added)). PAL itself was not claimed to be "proprietary software," but rather described as the embodiment of "proprietary software tools and processes" developed by PRT; in other words, the putting-together of the various components—including third-party software—was "proprietary" in the sense that the resulting "software development framework" was PRT's work product and intellectual property. Again, plaintiffs' claims of falsity are belied by the language of the prospectus itself.

Plaintiffs point out that at several points in the prospectus, PRT implies or states that it had proprietary software. (*See* Prospectus at 10, 31). I find that these isolated references, even if not "literally true," are not material, in light of the entire prospectus. As discussed above, the prospectus repeatedly discusses PRT's

use of third-party software. In addition, the prospectus disclosed the fact that PRT did not hold any patents or registered copyrights at the time of the IPO. (*See id.* at 10, 31). Furthermore, with the exception of the description of PAL, the references to "proprietary software" or "proprietary rights" are isolated and fleeting; the prospectus makes no material representations about the proprietary software or rights, but mentions them only in passing. PRT did not represent itself as a software company but rather presented itself as a IT services company that used software—including the software of other companies—to implement its IT solutions. In view of the prospectus as a whole, including defendants' representations about its reliance on third-party software and lack of patents or registered copyrights, these scattered references would not have misled a reasonable investor about the nature of the investment. *Olkey*, 98 F.3d at 5.

Finally, plaintiffs contend that the prospectus falsely represented that PRT provided "technologically advanced or competitively superior solutions" to clients, but plaintiffs point to no such representation in the prospectus, and it appears that the prospectus makes no such claim, either directly or indirectly. Even if such a claim could be inferred, the prospectus contains numerous explicit disclaimers about the potential technical and financial superiority of PRT's competitors. (*See, e.g.,* Prospectus at 9, 10, 31).

#### b. *Ability to Obtain Business from New and Existing Clients*

Plaintiffs claim that the prospectus materially overstated PRT's ability to gain additional business from existing clients and obtain new business from new clients in two ways. First, plaintiffs contend that because PRT hired IT professionals on a contract-by-contract basis, which "prevented [it] from building any continuing

---

5.  Plaintiffs persistently misquote the prospectus's description of PAL; in both the amended complaint and their opposition papers, they replace the word "bank" with the words "brand" or "band," without giving any indication that they are altering the text. (*See* Compl. ¶ 26, 26(b); Pl. Mem. at 9).

relationships with a client or developing consistency in bidding on or servicing subsequent clients" (Compl.¶ 26(a)), the prospectus falsely represented that PRT built "long-term relationships through its service offering, causing many clients to view PRT as an extension of their in-house IT organizations." (*Id.*).

■ Second, plaintiffs assert that the prospectus misrepresented the significance of PRT's "preferred vendor" status by implying that this status gave PRT a competitive advantage over other companies bidding for the same contracts, when in fact the "preferred vendor" status was often shared by hundreds of companies and thus conferred no meaningful competitive advantage. (*Id.* ¶ 26(e)). PRT further overstated the importance of its "preferred vendor" status, according to plaintiffs, by failing to disclose that prior to the IPO, it had "experienced significant problems with certain of its clients with whom it shared a 'preferred vendor' relationship such that it was likely that it would lose that status in the near future." (*Id.* ¶ 26(f)).

Once again, plaintiffs' allegations are contradicted by the prospectus itself. With respect to the claim that PRT falsely represented that it built "long-term relationships" with its clients, the prospectus reveals that in fact must of PRT's business in 1997 resulted from long-term relationships with clients. For example, the prospectus reported that "[i]n the first nine months of 1997, approximately 65% of the Company's revenues was generated from clients that have been PRT clients for *more than two years.*" (Prospectus at 27) (emphasis added). In addition, the prospectus noted that for *both* 1996 and the first three quarters of 1997, three clients— Chase Manhattan Bank, Philip Morris, and J.P. Morgan & Company—accounted for more than 10% of PRT's revenues. (*Id.* at 31). Plaintiffs do not dispute the truth of these statements, which refute their conclusory allegation that PRT misrepresented its ability to build "long-term relationships" with clients.[6] *Cf. Schoenhaut v. American Sensors, Inc.*, 986 F.Supp. 785, 794 (S.D.N.Y.1997) (dismissing "as a matter of law" plaintiffs' claim that prospectus failed to disclose that issuer's products were "obsolete" when sales figures showed that company was still selling product).

■ Plaintiffs' contentions regarding PRT's statements about its "preferred vendor" status are similarly unavailing, in light of the actual representations contained in the prospectus. Contrary to plaintiffs' assertions, the prospectus did not state or imply that its preferred vendor status was a "guarantee" of business or that PRT was able to "leverage" this status into increased business with every client. (*See* Compl. ¶ 26(e); Pl. Mem. 10–12). The prospectus only briefly described the preferred vendor status, and followed that description with a specific example of how that relationship benefitted PRT with respect to *one* Staff Augmentation client.[7]

---

6. At the same time, PRT also fully disclosed the fact that it could not guarantee repeat business, even on ongoing projects with existing clients. Under the heading "Contract Risk," the prospectus warns:

Most of the Company's contracts are terminable by the client following limited notice and without significant penalty. In addition, each stage of a project often represents a separate contractual commitment at the end of which the client may elect not to proceed to the next stage of the project.... [T]here can be no assurance that one or more of the Company's clients will not [terminate a material contract or materially reduce the scope of a large project] in the future.

(Prospectus at 9).

7. The prospectus reads:

An *example* of a development of a preferred vendor relationship involved a client which had over 600 IT consulting firms to provide IT personnel. The client realized that having such a large number of IT providers created logistical, cost and quality control issues, and decided to reduce the number of outside IT consulting firms to a small preferred group of 17. Because PRT was chosen as one of the preferred vendors, PRT experienced a three-fold increase in the number of IT professionals placed at the client. The Company has been able to leverage its preferred vendor relationship to provide higher margin SDC solutions and Strategic Consulting assignments to *this* Staff Augmentation client.

(Prospectus at 29). At the same time, in the "Contract Risk" section, the prospectus disclaimed any guarantees of future business from *any* client. (Prospectus at 9; *see also id.* at 8, 31).

Nor does the prospectus imply that PRT's preferred vendor status was "exclusive in nature," as plaintiffs contend. (Pl. Mem. at 10 n. 4). In fact, in the example of one of PRT's preferred vendor relationships, the prospectus relates that the client had designated *seventeen* preferred vendors. (Prospectus at 29).

Plaintiffs argue that PRT further misrepresented the significance of its preferred vendor relationships with clients by failing to disclose that it was "los[ing] out to its competitors bidding for the same contracts," despite the preferred vendor status, and that it had "experienced significant problems with certain of its [preferred vendor clientele] such that it was likely that it would lose that status in the near future." (Compl.¶ 26(e), (f)). This alleged omission is not misleading as a matter of law, because the prospectus disclosed these very risks. The prospectus clearly and unequivocally warned investors that the IT business was highly competitive: "The Company experiences intense competition. The market for services such as PRT offers is very broad and such services are offered by a large number of private and public companies, many of which are significantly larger than, and have greater financial, technical and marketing resources than, PRT." (*See* Prospectus at 9; *see also id.* at 31). In addition, as detailed above, the prospectus also warned that it could lose a client at any given time. (*See id.* at 9 (disclaiming any guarantee of future business from clients)).

Moreover, defendants had no duty to disclose the activities of PRT's competitors or to state publicly that the Company was losing ground to competitors in bidding for IT contracts. *See Schoenhaut,* 986 F.Supp. at 794 (citing cases).

### c. *Recruiting Ability and Employee Relations*

Plaintiffs allege that the prospectus materially overstated PRT's ability to recruit IT professionals and staff its consulting projects by (1) falsely claiming that the Company possessed a "competitive advantage" in recruiting and retaining IT professionals when in fact PRT's access to such professionals was "materially impaired and subject to numerous undisclosed risks" (Compl ¶ 28(a)); (2) failing to disclose the "true risks associated with PRT's method of recruiting IT professionals" from "one pool" of worldwide personnel "from which [sic] PRT competed for subcontractors with every other IT and [Y2K] company" (*id.* ¶ 28(d)); (3) falsely claiming that it used a "proprietary database" and an "automated technical assessment system" to recruit and evaluate IT professionals (*id.* ¶ 28(b), (c)); and (4) overstating the number of IT professionals it employed and misrepresenting the "nature and importance" of the non-compete covenants contained in those employees' contracts (*id.* ¶ 28(e), (f)).

### (1) *"Competitive Advantage" in Recruiting*

In response to plaintiffs' claim that PRT falsely represented that it held a "competitive advantage in attracting and retaining IT professionals" (Compl.¶ 28(a)), defendants argue this statement is not actionable because it is a vague statement of general optimism. I agree.

The prospectus reads: "As PRT replicates the SDC model in new locations, additional opportunities for geographic re-

(Prospectus at 29) (emphasis added). Plaintiffs attempt to extrapolate from this specific example a broad misrepresentation by PRT that it had been "able to leverage its preferred vendor relationship" into increased business across the board, with *every* client, but the actual text of the prospectus does not support

such a reading. Indeed, plaintiffs' interpretation can be substantiated only by selective quotation of the prospectus, as they do in both the amended complaint and their memorandum of law; plaintiffs repeatedly omit the last two words of the paragraph. (*See* Compl. ¶ 26(e); Pl. Mem. at 10).

location and career advancement will arise. The Company believes that this provides a competitive advantage in attracting and retaining IT professionals." (Prospectus at 26). Read in combination, these statements are forward-looking expressions of hope, adequately tinged with caution; PRT speaks of its future openings of SDCs, and cautiously states that it "believes" that these planned additional work sites give them a competitive edge in recruiting IT professionals. Moreover, this statement follows earlier cautions about the difficulties of recruiting IT professionals. Thus, in view of the "total mix" of information, the statements regarding PRT's belief in its "competitive advantage" cannot reasonably be found to be misleading. *See San Leandro*, 75 F.3d at 806–07, 811 (statement that company was "doing quite well within the competitive environment" was nonactionable "puffery"); *In re Software Publ'g Sec. Litig.*, No. 93–20246(RMW), 1994 WL 261365, at *5, *8 (N.D.Cal. Feb. 2, 1994) (statements "[w]e believe we have the combination of people and products in place to be successful" and "[t]he company is now positioned to effectively compete" were nonactionable statements of optimism).

#### (2) *"Undisclosed" Risks*

With respect to PRT's alleged failure to disclose certain risks involved with recruiting IT personnel, the prospectus is rife with references to the extremely limited pool of qualified IT professionals. (*See* Prospectus at 4, 6, 7, 25, 28). For example, the prospectus identified the personnel shortage as a "key industry trend" that "[would] continue to have a major influence on the worldwide IT services market" and warned that

There is a growing shortage of IT professionals in the United States, Western Europe, and Japan. This shortage of IT professionals is rising due to the need for many organizations to maintain legacy systems, the migration to new applications architectures and the relatively small population of trained IT professionals. Additionally, mass change issues, such as the Year 2000 problem, are

accelerating this increasing industry-wide shortage of IT professionals.

(Prospectus at 25).

In addition, the prospectus cautioned that the personnel shortage could have a material adverse effect on PRT's business, operating results, and financial condition:

The Company's success depends upon its ability to attract, develop, motivate and retain IT professionals who possess the necessary technical skills and experience or can be trained to deliver the Company's services. Qualified IT professionals are in high demand worldwide and are likely to remain a limited resource for the foreseeable future. There can be no assurance that PRT will continue to have access to qualified IT professionals, will be successful in retaining current or future IT professionals, or that the cost of employing and subcontracting such IT professionals will not increase due to shortages.

(Prospectus at 6; *see also id.* at 7, 26). In light of these explicit risk disclosures, plaintiffs' allegations of "undisclosed risks" in connection with PRT's recruitment of IT professionals fail as a matter of law. *See Olkey*, 98 F.3d at 9.

#### (3) *Recruiting Tools*

Plaintiffs claim that PRT falsely represented that it used certain recruiting tools. The amended complaint alleges that the prospectus falsely stated that PRT used an " 'automated technical assessment system' to evaluate and qualify IT personnel" when in fact it used such a system only in its New York office to evaluate a small percentage of IT professionals. (Compl.¶ 28(b)). In addition, plaintiffs assert that the prospectus misrepresented that PRT had "a proprietary database to aid in recruiting" when in fact it had no such database. (*Id.* ¶ 28(c)).

In response, defendants contend that the statements as set forth in the prospectus are true. According to defendants, PRT only claimed to "use" a proprietary database in recruiting; it did not represent that it owned such a database. (Def.

Mem. at 29). Furthermore, defendants argue that its limited use of the automated technical assessment system is not inconsistent with the prospectus's representation that "PRT evaluates and qualifies candidates prior to placing them with clients through an automated technical assessment system." (Prospectus at 30; *see* Def. Mem. at 29).

The two statements arguably are misleading, assuming that plaintiffs' factual assertions are true. First, with respect to the phrase "use of a proprietary database to aid in recruiting," the word "proprietary" modifies the word "database"; the false impression arguably created is that PRT makes use of a database that it owns. Second, the prospectus implies that PRT uses an automated technical assessment system to evaluate *all* IT candidates: "PRT evaluates and qualifies candidates prior to placing them with clients through an automated technical assessment system." (Prospectus at 30). The lack of any qualifying word before "candidates"—such as "some" or "certain" or "most"—arguably misleads the reader into believing that the system is used with every candidate.

Although the prospectus may be misleading with respect to the use of these recruiting tools, I find that these misstatements are immaterial. A reasonable investor would be concerned that PRT was recruiting and hiring qualified IT professionals, not with the means of hiring such personnel. Plaintiffs do not allege that PRT was unable to hire qualified professionals as a result of its failure to use the claimed tools; indeed, plaintiffs make no allegations at all about the quality of PRT's IT personnel.

Moreover, these vague representations are hardly significant when the "total mix" of information is considered. The phrase "proprietary database" is an ambiguous description of a recruiting "tool" that could certainly include even an informal collection of names such as a Rolodex of busi-

ness cards; the "automated technical assessment system" is similarly ambiguous. Most investors would consider these vague phrases to be nothing more than mere puffery that is easily discounted. In view of all the disclosures in the prospectus concerning the recruitment of IT professionals, a reasonable investor would not attach any importance to these alleged misstatements regarding PRT's recruiting and assessment tools in making the decision to invest in PRT, and accordingly, these statements are immaterial as a matter of law.

### (4) *Employees and Contracts*

Plaintiffs allege that the prospectus misrepresented both the number of IT professionals employed by PRT as well as "the nature and importance" of the no-compete covenants contained in its employees' contracts (Compl.¶ 28(e), (f)). Neither of these alleged misstatements is sufficient to state a claim.

First, plaintiffs allege that the prospectus overstated fivefold the number of IT professionals it employed and subcontracted with just prior to the IPO. The prospectus stated that "[o]n September 30, 1997, PRT employed and subcontracted with 665 IT professionals." (Prospectus at 27). In fact, plaintiffs contend, "[a]t the time of the [IPO], PRT employed and subcontracted with only approximately 170 IT professionals." (Compl.¶ 28(f)). Plaintiffs' brief makes clear, however, that their figure of 170 IT professionals includes only those who were in PRT's "permanent employ," whereas defendants' count in the prospectus also included those IT professionals who worked for PRT on a "temporary basis." (*See* Pl. Mem. at 18; Def. Reply Mem. at 16). No reasonable investor could find that PRT's inclusion of "temporary" employees was misleading, in view of the bid-based nature of the business, the industry practice of subcontracting IT professionals who worked for more than one IT company, and all the other disclosures in the prospectus.[8]

---

**8.** In addition, defendants did not claim that PRT's employee count included only full-time,

permanent employees and subcontractors; as noted above, the prospectus states only that

Second, plaintiffs claim that the prospectus "represented that [the] no-compete covenants [contained in its employment contracts with IT subcontractors] provided a secure base of IT professional personnel for PRT and provided PRT with a competitive advantage." (Compl.¶ 28(e)). An examination of the actual text of the prospectus reveals no such representations; rather, the prospectus provided a subdued description of the non-compete covenants, without touting any kind of advantage produced by the contract provisions:

> Each of the employment agreements contains covenants that the employee or subcontractor will not compete with the Company at the accounts to which the employee or subcontractor was introduced for a period of 12 months after termination of employment or subcontractor relationship with PRT.

(Prospectus at 30). Moreover, in light of PRT's explicit and repeated disclaimers concerning the scarcity of IT professionals (Prospectus at 6, 25), a reasonable investor would not read the non-compete covenant description as a guarantee of a "secure base" of IT personnel for PRT.

Plaintiffs argue that the prospectus failed to disclose that non-compete covenants are often disregarded by IT companies, thus rendering any statements about such clauses false and misleading. (Compl.¶ 28(e)). The Court does not agree, however, that this is a "fact" that defendants were required to disclose. Rather, the proposition that non-compete covenants are often breached in the IT services business is a debatable one—a matter of opinion, as opposed to a "fact." Even if the proposition is not debatable and, as plaintiffs contend, it was "standard, accepted practice in the industry to disregard th[e]se covenants," then this "fact" would be self-evident; a reasonable investor deciding whether to invest in an IT services company undoubtedly would be well aware of this "industry practice."

Finally, even if it was an industry practice to disregard the non-compete clauses in employment contracts, the omission of a statement about the illusory nature of such covenants was immaterial, for such a practice could benefit PRT just as much as it hurt PRT. Non-enforcement of the covenants would mean that PRT would be able to hire IT personnel that it would not have had access to if such covenants were enforced. In other words, while PRT would not be able to contractually "lock up" its IT professionals to prevent them from working for competing IT companies, PRT's competitors likewise could not prevent their own talent from working for PRT.

#### d. *Y2K Business*

According to plaintiffs, the prospectus materially overstated PRT's ability to obtain Y2K business by representing that PRT was "poised for increasing growth in revenues and profits by reason of [Y2K] business" and that it was "uniquely qualified and well-positioned to satisfy" client demand for Y2K solutions because of its "technological expertise and superior ability to attract IT professionals." (Compl.¶ 29).

Once again, many of plaintiffs' Y2K-related claims are refuted by the explicit disclosures of the prospectus. For example, plaintiffs allege that the prospectus failed to disclose that "PRT did not have the technological capability to provide adequate services for any significant [Y2K] project" without relying on third-party software. (Compl.¶ 30(a)). As discussed previously, however, the prospectus repeatedly disclosed PRT's reliance on other companies' software for certain of its Y2K projects and other IT solutions. (*See* Prospectus at 9, 10, 28, 31).

In addition, plaintiffs also claim that the prospectus misrepresented that PRT had been or would be able to recruit sufficient IT personnel to obtain Y2K consulting business (Compl.¶ 30(d)); again, the pro-

PRT employed and subcontracted with "665      IT professionals."

spectus disclosed the worldwide shortage of qualified IT personnel and its potential effects on PRT's consulting business. (*See* Prospectus at 4, 6, 7, 25).

Finally, plaintiffs' contention that PRT failed to reveal its limited Y2K experience is belied by the prospectus's disclosure that "[t]he Company realized less than 10% of its total revenues from [Y2K] solutions in each of fiscal years 1995 and 1996 and in the first nine months of 1997." (Prospectus at 8; *see* Compl. ¶ 30(c)). With respect to each of the foregoing statements, the very information plaintiffs claim was not disclosed was in fact revealed in the prospectus. Accordingly, none of these statements are actionable.

■■■ Plaintiffs also challenge the prospectus's representation that "[t]he Company expects that it will receive increased revenues for Year 2000 solutions" (Compl. ¶¶ 29, 33(d)), but this claim also fails as a matter of law, for the statement clearly "bespeaks caution." This prediction of increased revenues, presented in the "Risk Factors" section of the prospectus under the heading "Potential Decreases in Demand for Year 2000 Services," is surrounded by specific cautionary language warning that such revenues may not materialize:

> The Company expects that it will receive increased revenues for Year 2000 solutions. After the year 2000, the Company believes that demand for Year 2000 solutions will continue; however, such demand is expected to begin to diminish as many Year 2000 solutions are implemented and tested. . . . In ad-

dition, by utilizing significant resources during the next several years to solve its clients' Year 2000 problems, the Company's ability to deliver other IT services could be adversely affected. Finally, the Company relies on licenses from outside parties for certain of its Year 2000 software tools; any disruption of the relationship with such parties could adversely affect the Company's ability to provide Year 2000 solutions and thereby have a material adverse effect on the Company's business, operating results and financial condition.

(Prospectus at 8–9). The prospectus's prediction of increased Y2K business is counterbalanced by language that bespeaks caution, and accordingly, this statement cannot be a basis for liability.[9]

■■■ In addition, plaintiffs claim that PRT's failure to disclose that it had unsuccessfully bid on five Y2K consulting projects—for Philip Morris, Prudential, Virginia Power, Circuit City, and Wheat First Securities—prior to the IPO was misleading. (Compl. ¶¶ 30(e), 32(a)—(c)). In particular, plaintiffs contend that because the prospectus "[gave] examples of specific customer contracts" and generally described PRT's relationships with its customers in highly positive terms, PRT had a duty to disclose that it was not securing Y2K business from its "established" clients. (*Id.* ¶ 30(e); Pl. Mem. at 22–23).

Plaintiffs' argument is meritless. As defendants point out, the prospectus made no representations about any past, present, or expected Y2K projects with any of the five clients named by plaintiffs. The prospectus simply recites, as required by SEC regulations,[10] the names of its major cus-

---

9. Moreover, PRT's prediction of increased revenues is precisely the sort of vague optimistic statement or "puffing" deemed nonactionable under the securities laws. *See San Leandro*, 75 F.3d at 805–06, 811 (dismissing claim based, in part, on statement "we are budgeting for and expecting a strong year for all of our businesses"); *Schoenhaut*, 986 F.Supp. at 792 & n. 9 (statements that company predicted "continued strong consumer demand" and "anticipated increasing consumer demand" were "nothing more than loose prophecies of future performance communicating only vague expectations").

10. SEC Regulation S–K, Item 101(c)(1)(iii) requires a 1933 Act registrant of securities to disclose "the name of any customer and its relationship, if any, with the registrant or its subsidiaries shall be disclosed if sales to the customer by one or more segments are made in an aggregate amount equal to 10 percent or more of the registrant's consolidated revenues and the loss of such customer would have a material adverse effect on the registrant and its subsidiaries taken as a whole." 17 C.F.R. § 229.101(c)(1)(vii) (1999).

tomers, a list that included Philip Morris and Prudential (see Prospectus at 8, 31), but it does not, as plaintiffs claim, tout PRT's competitive advantages in the Y2K area with these *particular* clients. Because the prospectus did not make any specific representations that PRT had received or was expecting to receive any Y2K business from the five clients cited by plaintiffs, PRT was not required to disclose the fact that it had not proceeded beyond the bidding stage on certain of these clients' Y2K projects.

Judge Jones's opinion in *Schoenhaut* is particularly instructive on this point. In *Schoenhaut*, the prospectus disclosed that one customer accounted for the largest percentage of the defendant company's sales, but failed to disclose that sales to that major customer were decreasing, in both absolute terms and percentage-wise, prior to the IPO. *Schoenhaut*, 986 F.Supp. at 793. In holding that the failure to disclose the decreasing level of sales was not a material omission as a matter of law, the Court emphasized that the prospectus did not list current sales volume to that customer or predict future sales levels, or even suggest that this customer would remain a customer. (*Id.*). The same holds true here; PRT's prospectus did not state that PRT had or expected to gain any Y2K business from these particular companies, nor did it represent that these customers would remain customers. Accordingly, PRT's failure to disclose the unsuccessful bids was not a material omission as a matter of law. *See also In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1484 (N.D.Cal.1992) (no duty to disclose fact that customers listed in prospectus were not currently ordering from company because prospectus did contain any representations about current or future orders from those customers), *aff'd* 11 F.3d 865 (9th Cir.1993); *In re Convergent Tech. Sec. Litig.*, 721 F.Supp. 1133, 1135–36 (N.D.Cal. 1988) (no duty to disclose "trend" of declining orders from major customer when company's internal estimate of expected orders was never disclosed), *aff'd* 948 F.2d 507 (9th Cir.1991).

Furthermore, while it may be true that PRT "described [its] ability to generate [Y2K] consulting business in highly positive terms" (Compl.¶ 31), it is also true that PRT tempered that enthusiasm with ample disclosures about the variables that could affect its business, including its Y2K business. As noted earlier, the prospectus explained in detail the independent nature of each IT project awarded to PRT and the lack of any contractual requirement or assurance that clients would hire PRT for additional projects. (*See* Prospectus at 8). In addition, contrary to plaintiffs' assertions, the prospectus did not represent that PRT had any sort of competitive advantage in the Y2K market, but rather cautioned that many of its competitors had superior financial, technical, and marketing resources. (*See id.* at 9). Finally, the prospectus disclosed PRT's limited Y2K consulting experience. (*See id.* at 8).

Plaintiffs make much of the fact that PRT apparently was unable to gain Y2K business from certain preferred vendor clients, such as Philip Morris and Prudential. (Compl.¶¶ 31, 32(a)—(c)). As discussed earlier, however, the appellation "preferred vendor" was not synonymous with "guaranteed vendor," and the prospectus never assured potential investors that PRT would be able to obtain Y2K business from its preferred vendor clients. Indeed, the prospectus specifically disclaimed any guarantee of future business from any client—it made no representations of continued business from new clients, existing clients, or preferred vendor clients. (*See* Prospectus at 9). In light of these disclaimers, the prospectus's failure to disclose that PRT had not received certain Y2K projects from these clients is not actionable.

In the end, while it may be true, as plaintiffs allege, that the prospectus "described [PRT's] ability to generate [Y2K] business in highly positive terms," this rosy outlook was tempered by numerous specific risk disclosures about the potential pitfalls in the Y2K consulting busi-

ness. Moreover, the failure to disclose unsuccessful Y2K bids did not render the prospectus misleading. Accordingly, plaintiffs' Y2K-related claims must be dismissed.

### e. *Risk Factors*

Plaintiffs contend that certain risk factors set forth in the prospectus and relied upon by defendants in disclaiming liability are themselves false and misleading, for PRT's warnings were presented as "hypothetical future possibilities" when in fact, at the time of the IPO, these contingencies had already occurred. (Compl. ¶ 33(a)—(c)). Plaintiffs' arguments are rejected, for plaintiffs have failed to allege how the supposed historical or current facts existing at the time of the IPO make these risk factors false and misleading.

■ For example, plaintiffs claim that the statement "[t]here can be no assurance that PRT will continue to have access to qualified IT professionals [or] will be successful in retaining current or future IT professionals" was false because PRT had already had—and was continuing to have—difficulty obtaining "sufficiently qualified IT professionals in sufficient numbers" to bid on consulting projects. (Compl. ¶ 33(a)). Plaintiffs apparently take issue with the use of the phrase "will continue"; the statement could be read to imply that PRT *currently* had access to qualified IT professionals, and that future access could not be guaranteed. Even assuming that PRT was having difficulties obtaining IT personnel, however, the implied representation that PRT currently had access to qualified IT professionals was not false. Plaintiffs' allegation that PRT was unable to obtain *"sufficient numbers"* of IT personnel is not inconsistent with the prospectus's implicit representation that PRT had access to qualified IT professionals. In other words, the prospectus implied that PRT had access to IT professionals, and the complaint does not allege facts that would render that statement false.

■ Similarly, plaintiffs' challenge to the risk statement concerning PRT's ability to operate profitably in the future fails because plaintiffs do not allege how the purported historical or current "facts" render the prospectus false and misleading. Plaintiffs claim that the statements conditioning PRT's future profitability on its ability to develop new clients and cultivate additional business from existing clients were false and misleading because at the time of the IPO, PRT had not been able to obtain "any significant new customers beyond those named in the [p]rospectus" or, with respect to PRT's "existing client base[ ]," to generate "new revenue sources from their Year 2000 business." (Compl. ¶ 33(b), (c)).

Again, even assuming that these "facts" as alleged by plaintiffs are true, the representations contained in the prospectus are not inconsistent. The prospectus reads: "[I]n order to operate profitably in the future, the Company must accomplish some of the following objectives: (i) increase the amount of services rendered to existing clients and develop new clients, [and] (ii) develop and realize additional revenue sources." (Prospectus at 7). In their complaint, plaintiffs implicitly concede that PRT did have *some* new clients; the fact that they did not have *"significant* new clients *beyond those listed in the [p]rospectus"* does not render the prospectus false and misleading. Likewise, the "fact" that PRT was unable to obtain "new revenue sources" by getting Y2K business from its existing clients is not inconsistent with the statements "[PRT] must ... increase the amount of services rendered to existing clients and ... develop and realize additional revenue sources"; plaintiffs allege only that PRT was not increasing services to existing clients and developing additional revenue sources by way of increased *Y2K* business, not that it had failed to gain *any* increased business or revenues from other types of IT services consulting.

█] Plaintiffs' third claim regarding an allegedly false risk factor fails on similar grounds. Plaintiffs contend that because PRT had already failed to obtain Y2K business from certain existing clients at the time of the IPO, statements such as "[t]he Company expects that it will receive increase revenues for Year 2000 solutions" and "[t]here can be no assurance … that the Company will be successful in generating additional business from its Year 2000 clients" were false and misleading. (Compl.¶ 33(d)). Again, the historical "fact" that PRT may have not received certain Y2K projects from certain existing clients is not inconsistent with the prospectus's projections of increased Y2K business and cautions that such business might not materialize. In other words, the "fact" that these clients did not award Y2K business to PRT would not mean that PRT would obtain *no* future Y2K business whatsoever.

Finally, plaintiffs contend that the risk factor concerning PRT's intellectual property rights was false and misleading because it failed to disclose PRT's dependence on third-party technology for its Y2K solutions. (Compl.¶ 33(e)). As discussed in detail above, the prospectus repeatedly and explicitly revealed the Company's reliance on other companies' software for its IT services, including Y2K consulting. (*See* Prospectus at 3, 9, 24, 25, 26, 28). Accordingly, this claim, too, must fail.

In view of the foregoing, and looking at the prospectus as a whole, I cannot reasonably conclude that "defendants' representations, taken together and in context, would have mis[led] a reasonable investor" about the nature of the investment in PRT. *Olkey*, 98 F.3d at 5. As in *Olkey*, "the prospectus[ ] when read in [its] entirety [is] not overly sanguine but instead bespeaks caution." *Id.* at 5 (internal citations omitted); *see also Pincus*, 936 F.2d at 763; *Sheppard v. TCW/DW Term Trust 2000*, 938 F.Supp. 171, 179 (S.D.N.Y.1996) (dismissing §§ 11 and 12 claims where "the various risks inherent in purchasing shares in the [investment] were adequately disclosed.").

Accordingly, plaintiffs' §§ 11 and 12 claims are dismissed, as to all defendants, for failure to state a claim. Because plaintiffs' § 15 "controlling persons" liability claim is predicated upon the existence of an underlying §§ 11 or 12 violation, this claim is dismissed as well. *See Milman*, 72 F.Supp.2d at 235.

Plaintiffs have requested leave to replead in the event this Court granted defendants' motions to dismiss. (*See* Pl. Mem. at 43 n. 27). While leave to amend a complaint "shall be freely given when justice so requires," Fed.R.Civ.P. 15(a), it is within the sound discretion of the court whether to grant leave to amend. *See, e.g., Hinerfeld*, 1998 WL 397852, at *8 (citing *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). As plaintiffs have already had one opportunity to amend their complaint, and because all of the claims contained in that amended complaint are "belied by the plain language of the prospectus, it would be an exercise in futility as well as a waste of judicial resources to allow further amendment." *Id.* (citations omitted); *see also Pallickal v. Technology Int'l, Ltd.*, No. 94 Civ. 5738(DC), 1996 WL 153699, at *3 (S.D.N.Y. Apr. 3, 1996).

## CONCLUSION

Defendants' motions to dismiss are granted and the amended complaint is hereby dismissed with prejudice as to all defendants. Plaintiffs' request for leave to amend the amended complaint is denied.

SO ORDERED.