Mordechai GURARY, Plaintiff–
Appellee,

v.

Isaac WINEHOUSE and Isaac Wine-
house, doing business as Wall &
Broad Equities, Defendants,

Nu–Tech Bio–Med, Inc., Defendant–
Appellant.

Docket No. 00–7151.

United States Court of Appeals,
Second Circuit.

Argued Sept. 19, 2000.

Decided Dec. 19, 2000.

Martin E. Karlinsky, Camhy Karlinsky & Stein LLP, New York, N.Y. (Douglas A. Amedeo, Camhy Karlinsky & Stein LLP, New York, NY, on the brief), for Defendant–Appellant.

David Jaroslawicz, Jaroslawicz & Jaros, New York, N.Y. (Robert J. Tolchin, Jaroslawicz & Jaros, New York, NY, of counsel), for Plaintiff–Appellee.

Before WALKER, Chief Judge, and MINER and POOLER, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant Nu–Tech Bio–Med, Inc. ("Nu–Tech") appeals from an order entered in the United States District Court for the Southern District Court of New York (Stanton, *J.*) denying its motion for sanctions pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 11 ("Rule 11") against plaintiff-appellee Mordechai Gurary ("Gurary").

Gurary brought suit against Nu–Tech and defendant Isaac Winehouse ("Winehouse") to recover damages for securities fraud pursuant to section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j, and 17 C.F.R. § 240.10b–5 ("Rule 10b–5") thereunder. The district court granted summary judgment in favor of both defendants and denied their motions for sanctions under Rule 11. We affirmed the summary judgment but remanded for further findings regarding compliance with Rule 11 as mandated by the PSLRA. *See Gurary v. Winehouse*, 190 F.3d 37, 47 (2d Cir.1999). On remand, the district court concluded that sanctions were not warranted because "[a] conceivable extension of existing law might" render Gurary's claims of securities fraud properly pleaded. *Gurary v. Winehouse*, No. 97CIV3803, 2000 WL 20706, at *1 (S.D.N.Y. Jan.12, 2000). For the reasons that follow, we affirm in part, and vacate in part the order of the district court and remand for further proceedings consistent with this opinion.

## BACKGROUND

In November 1996, Nu–Tech raised nearly $14 million by issuing shares of Series A Convertible Preferred Stock (the "preferred"). That stock, while having no voting rights and paying no dividends, was convertible into common stock at the lesser of $17.50 per share or 75 percent of the average closing price of the common stock for the five trading days prior to the date of the holder's notice of conversion. Because the preferred paid no dividends, had no voting rights, and was convertible to common stock at a bargain price, it would almost always be converted. In addition, purchasers of the preferred were likely to profit from conversion no matter what happened to the price of the common stock, provided that the company survived. That is, so long as the price of the common did not fall more than 25 percent after conversion, shareholders of the preferred would profit by conversion and sale of the common into which the preferred was converted.[1]

This litigation arose out of an alleged scheme by defendant Winehouse in which Winehouse allegedly organized a "cartel" to purchase a percentage of Nu–Tech convertible stock in the names of nominees. He allegedly arranged for a number of

---

1. For example, if the common traded below $23.33 per share immediately prior to conversion, the preferred would be converted at 75 percent of the price (which would be less than $17.50). However, if the common traded above $23.33 immediately prior to conversion, the preferred would be converted at $17.50 (which would be less than 75 percent of the trading price of the common). In either scenario, investors would profit.

securities firms to become market makers in Nu–Tech common stock, and then proceeded to sell the common stock short,[2] allegedly to drive down the price of the common stock. Gurary concedes that this alleged manipulation did not begin before November 6, 1996.

On October 31, 1996, Gurary purchased 1,000 shares of Nu Tech common stock at $14.60, and then on November 7, 1996, purchased another 5,500 shares at $15.50 per share. After becoming concerned about his investment when the stock price began to decline, Gurary spoke with J. Marvin Feigenbaum ("Feigenbaum"), chairman of Nu–Tech, sometime in December 1996. Feigenbaum assured Gurary that he had alerted Winehouse that Nu–Tech would refuse to register the common stock into which the preferred was convertible unless Winehouse and his group stopped shorting the common stock. Feigenbaum predicted that this "threat" would convince Winehouse to stop shorting the stock because a refusal to register the common issued upon conversion would force Winehouse to cover his short position by purchasing Nu–Tech common stock at a possibly higher price in the open market. Based on Feigenbaum's assurances, Gurary purchased another 1,000 shares on December 24, 1996, at a price of $11.75 per share. Gurary claims to have subsequently learned that Winehouse and his associates arranged to "borrow" an unlimited number of shares from market makers for the express purpose of continuing to short the stock using nominee names.

Gurary spoke to Feigenbaum again on February 18, 1997. Feigenbaum told Gurary that he had met that day with Winehouse and others in another attempt to stop the short selling. Feigenbaum explained to Gurary that Nu–Tech had offered to repurchase the group's preferred shares at cost plus ten percent and to allow the group to keep its existing profits from the short sales if it would cease its activities. Although Winehouse refused the offer, Feigenbaum told Gurary that Nu–Tech would not surrender to Winehouse and would refuse to register the short sellers' shares. Apparently comforted by these assurances, Gurary bought another 8,350 shares of Nu–Tech common at a price of $11.57 that same day.

On March 12, 1997, Feigenbaum and another Nu–Tech board member met with Winehouse and asked that Winehouse and his group accept registration of the common stock into which their preferred was convertible over a period of twelve months rather than insisting that it be registered immediately. Winehouse refused this offer also and said that he would continue to sell short. Nu–Tech common stock dropped approximately $6 per share over the next two days as the Winehouse group continued its short sales. Six days later, Gurary, in a conference call arranged by an intermediary, spoke directly with Winehouse, who allegedly admitted to him that he deliberately had shorted the stock to drive the price down, that he intended to continue, and advised Gurary to sell his shares because the price would drop to "a dollar."

On May 23, 1997, Gurary brought suit against Nu–Tech and Winehouse in the United States District Court for the Southern District of New York as a result of the alleged manipulation of the Nu–Tech stock. Gurary's complaint principally alleged that defendants Winehouse and Nu–Tech manipulated Nu–Tech's common stock in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, by making numerous misstatements and omissions of material fact in connection with the purchase and sale of the convertible preferred stock and the shorting of

**2.** A short sale involves the "sale of a security that the seller does not own or has not contracted for at the time of sale, and that the seller must borrow to make delivery." Black's Law Dictionary 1339 (7th ed. 1999).

the common stock.[3]

Both defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. In an Affidavit In Opposition to defendants' motion, Gurary's counsel, David Jaroslawicz, requested that he be granted leave to amend the complaint if the district court discovered any pleading deficiency. The district court, observing that Gurary's claims were based on four purchases, two purchases on October 31, 1996 and November 7, 1996, and two later purchases on December 24, 1996 and February 18, 1997, granted the motion in favor of Winehouse and Nu–Tech, after converting their 12(b)(6) motion into one for summary judgment.[4] However, the district court did not comment on Gurary's request for leave to amend and therefore implicitly denied it.

Gurary appealed to this Court, and defendants Nu–Tech and Winehouse cross-appealed on the grounds that the district court improperly denied their motions for sanctions made pursuant to the PSLRA. In an opinion dated August 24, 1999, we affirmed in part, and vacated and remanded in part. With respect to Gurary's first purchase on October 31, 1996, we concluded that this purchase failed to state a cognizable claim under Rule 10b–5 because Gurary failed to "allege culpable deception in connection with the purchase or sale of a security" in that the alleged manipulation did not commence until November 6, 1996, and Gurary's first purchase preceded that date. *Gurary*, 190 F.3d at 45 (internal quotation marks omitted). We also concluded that Gurary's second purchase failed to state a cognizable claim under Rule 10b–5 because Gurary, at the very

most, paid less for the security on November 7, 1996, than he otherwise would have as a result of the defendants' alleged fraud. We noted that a defrauded buyer may only recover "the excess of what he paid over the value of what he got," not the opposite. *Id.* at 46 (internal quotation marks omitted). With respect to Gurary's last two purchases, we concluded that because "there [was] no suggestion in the complaint or in Gurary's affidavit that Feigenbaum did not intend to do just what he promised at the times he made the statements [to Gurary]," Gurary's claim under Rule 10b–5 was "fundamentally flawed" as it failed to allege that Feigenbaum secretly intended not to perform or knew that he could not perform. *Id.* at 44. We also vacated and remanded in part for the district court to make "findings regarding compliance with Rule 11(b) [as mandated by the PSLRA]." *Id.* at 47.

In an order dated January 12, 2000, the district court determined that sanctions were not warranted because Gurary "could colorably argue [based on a conceivable extension of the law:] (1) that he relied on the market price as indicating the fair market value of Nu–Tech common stock for his first two purchases, only to see it depressed by illegal market manipulation in violation of ... the ... Exchange Act ..., and (2) that in reliance on Feigenbaum's promise to prevent further manipulation and stabilize the price, [Gurary] made two further purchases on which (the promises proving worthless) he suffered even more losses." *Gurary*, 2000 WL 20706, at *1. In addition, the district court noted that "[a]lthough a more scholarly and meticulous practitioner, or one more

---

3. Gurary also brought a claim under section 349 of the New York General Business Law and sought a preliminary injunction to enjoin Nu–Tech from registering the convertible preferred stock pending the outcome of this action. These two pendent state law claims were dismissed for lack of subject matter jurisdiction after summary judgment was granted in favor of the defendants, and we affirmed. *See Gurary,* 190 F.3d at 47 n. 10.

4. The district court converted these motions pursuant to Federal Rule of Civil Procedure 12(b)(2) because it considered Gurary's Affidavit In Opposition in rendering its decision. We approved the district court's conversion in the previous appeal. *See Gurary,* 190 F.3d at 43.

expert in federal procedure and securities law, might have foreseen that the complaint would be dismissed, it cannot be said that a competent attorney could not form the requisite responsible belief as to the validity of [Gurary's] claims." *Id.* (internal quotation marks omitted). Nu Tech now appeals the district court's order.[5] We affirm in part, and vacate and remand in part for further proceedings consistent with this opinion.

## DISCUSSION

I.  The Private Securities Litigation Reform Act of 1995 and Rule 11

In 1995, Congress passed the PSLRA to give "teeth" to Rule 11, "[r]ecognizing ... the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims, and [because] ... [e]xisting Rule 11 has not deterred abusive securities litigation." *Simon De-Bartolo Group, L.P. v. Richard E. Jacobs Group. Inc.*, 186 F.3d 157, 166-67 (2d Cir. 1999) (internal quotation marks omitted). The PSLRA, which added section 21D(c), codified at 15 U.S.C. § 78u–4(c)(1), to the Exchange Act, requires that a district court make specific findings as to a party's compliance with Federal Rule of Civil Procedure 11(b) at the conclusion of a case arising under the Exchange Act, *see Simon DeBartolo Group, L.P.*, 186 F.3d at 167 (citing 15 U.S.C. § 78u–4(c)(1)), and also *mandates* the imposition of sanctions if the court determines that Rule 11 has been violated. *See* 15 U.S.C. § 78u–4(c)(2).

If a court finds a Rule 11 violation, "a rebuttable presumption [arises] that the appropriate sanction for a complaint that substantially fails to comply with Rule 11(b) 'is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.'" *Id.* (quoting 15 U.S.C. § 78u–4(c)(3)(A)(ii)). However, if a party against whom sanc-

tions will be imposed successfully meets its burden by providing sufficient "rebuttal evidence" under 15 U.S.C. § 78u–4(c)(3)(B) that such fees and expenses are not appropriate, then courts should "award the sanctions [they] deem[ ] appropriate pursuant to Rule 11." 15 U.S.C. § 78u–4(c)(3)(C). The PSLRA does not alter the substantive standards for finding a Rule 11 violation but circumscribes "courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found." *Simon DeBartolo Group, L.P.*, 186 F.3d at 167.

Rule 11(b) provides in relevant part that:

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed.R.Civ.P. 11(b). The 1993 Advisory Committee Notes explain that Rule 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Also, "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into

---

5.  Defendant Winehouse is not a party to the instant appeal.

account in determining whether paragraph [ (b) ](2) has been violated. Although arguments for a change of law are not required to be specifically so identified, a contention that is so identified should be viewed with greater tolerance under the rule." *Id.* While monetary sanctions may be imposed in some circumstances under Rule 11, *see* Fed.R.Civ.P. 11(c)(2), they "may not be awarded against a represented party for a violation of subdivision (b)(2)," Fed.R.Civ.P. 11(c)(2)(A), because "responsibility for such violations is more properly placed solely on the party's attorneys." Fed.R.Civ.P. 11 (advisory committee notes to 1993 amendments); *see also Simon DeBartolo Group, L.P.,* 186 F.3d at 166.

## II. Standard of Review

■ We review a district court's determination with respect to sanctions under the PSLRA and Rule 11 for abuse of discretion. *See Simon DeBartolo Group, L.P.,* 186 F.3d at 167 (citing *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)). Rule 11 is violated when it is "clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Id.* (quoting *Mareno v. Rowe,* 910 F.2d 1043, 1047 (2d Cir.1990)) (internal quotation marks omitted). That is, material errors of law constitute "per se abuses of discretion." *Id.; see also Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. 2447 (concluding that an erroneous view of the law would constitute abuse of a court's discretion); *Sussman v. Bank of Israel,* 56 F.3d 450, 456 (2d Cir.1995) (same); *see also Pierce v. F.R. Tripler & Co.,* 955 F.2d 820, 831 (2d

Cir.1992) (finding an abuse of discretion where the district court awarded sanctions against a party who has a good faith basis to pursue legal argument supported by one state court decision in the absence of contrary controlling authority).

## III. Imposition of Sanctions

■ Citing *Eastway Construction Corp. v. City of New York,* appellant Nu–Tech asserts generally that the district court abused its discretion in denying sanctions against defendant-appellee Gurary because his claims against Nu–Tech involving all four purchases "failed to satisfy fundamental and threshold requirements for a Rule 10b–5 claim" and that Gurary has "failed . . . to suggest *any* reason that he could have achieved 'success under existing precedents,' and . . . has failed to advance any 'reasonable argument . . . to extend, modify or reverse the law as it stands.'" 762 F.2d 243, 254 (2d Cir.1985). We agree with respect to Gurary's first two purchases, on October 31, 1996 and November 7, 1996, respectively, but disagree with respect to Gurary's December 24, 1996 and February 18, 1997 purchases.[6]

### A. The Initial Purchases: October 31, 1996 and November 7, 1996

■ The district court on remand concluded that sanctions were inappropriate because Gurary "could colorably argue . . . that he relied on the market price as indicating the fair market value of Nu–Tech common stock for his first two purchases, only to see it depressed by illegal market manipulation in violation of section 10(b) of the Securities Exchange Act of 1934." *Gurary,* 2000 WL 20706, at *1. That conclusion ignores both the plain language of

---

**6.** Gurary argues that the issue on appeal here is moot because we "overlooked" the fact the district court had already rendered such findings, and there was no need to remand. We disagree. First, we concluded that remand was required because the "district court made no findings regarding compliance with Rule 11(b)." *Gurary,* 190 F.3d at 47. Second, the only "findings" made by the district court at the time it granted summary judgment included a conclusory statement that "[t]he claims and arguments made in the complaint . . . were 'warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law' . . . and were not 'presented for any improper purpose.'" Accordingly, we have yet to review specific findings of the district court as mandated by the PSLRA.

the Exchange Act and well-settled case law prohibiting recovery on any claims arising out of Gurary's first two purchases, and we therefore conclude that the district court abused its discretion by not imposing sanctions in connection with these claims.

Section 10(b) of the Exchange Act and Rule 10b–5 thereunder provide that a plaintiff must allege material misstatements or omissions indicating an intent to deceive or defraud *"in connection with the purchase or sale of a security."* 17 C.F.R. § 240.10b–5 (emphasis added); *see also Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737–38, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Gurary's complaint alleges a violation of 10b–5 with respect to his first purchase on October 31, 1996, although Gurary concedes that the alleged manipulation of Nu–Tech's stock did not begin until at least November 6, 1996. Based on the plain language of section 10(b) and well-settled case law, Gurary's October 31, 1996 purchase could not under any circumstances give rise to a Rule 10b–5 cause of action because that purchase occurred before any alleged deception began, and therefore could not be in connection with the purchase or sale of a security. *See, e.g., Blue Chip Stamps,* 421 U.S. at 737–38, 95 S.Ct. 1917; *see also* 15 U.S.C. § 10(b); 17 C.F.R. § 240.10b–5. Accordingly, Gurary's claim based on his October 31, 1996 security purchase was not warranted by existing law.

Nor could Gurary's claim be supported by any colorable argument for a change in existing law. The "in connection with the purchase or sale of a security" requirement of section 10(b) and Rule 10b–5 would prohibit a court from adopting a rule that would support Gurary's claim. This is not a case, in other words, in which a litigant seeks only to swim upstream against the current of stare decisis, in which case a particularly trenchant argument for rejecting existing precedent might be availing. Rather, the statute and regulation applicable here are incapable of judicial revision and thus precluded the district court from adopting any theory that would impose liability for a purchase entirely unconnected with alleged fraud.

Similarly, Gurary's claim based on his second purchase was not sustainable under any existing theory of law. Under well-settled principles, a buyer defrauded in violation of the securities laws may "recover only the excess of what he paid over the value of what he got, not … the difference between the value of what he got and what it was represented he would be getting." *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 65 F.3d 1044, 1049 (2d Cir.1995) (quoting *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir.1971)) (internal quotation marks omitted). That is, if the price of the common stock had been depressed because of the alleged manipulation, then a purchaser of a security actually benefits from that price decline by purchasing the stock at a lower price than he otherwise would have paid. Gurary alleged that the manipulation began on or about November 6, 1996, one day before his second purchase. As a result, if we infer that the short selling scheme actually depressed the price of the common stock on November 7, 1996, then Gurary would have benefitted from that manipulation by purchasing at a lower price than he otherwise would have paid. Consequently, because Gurary paid less for the security as a result of the defendants' alleged fraud or manipulation, there is no excess of price over value, and Gurary may not recover under Rule 10b–5. *See, e.g., Levine,* 439 F.2d at 334. Accordingly, Gurary's 10b–5 claim against Nu Tech with respect to this second purchase was not warranted under existing law because it directly contradicts well-settled principles of Exchange Act jurisprudence.

Gurary made no argument before the district court for modification or extension of the law that would justify imposition of liability for his second purchase, and he also expressly refused to make any such argument on appeal. Although litigants are not required to articulate their argu-

ments for legal change, *see* Fed.R.Civ.P. 11 (advisory committee notes to 1993 amendments) ("[A]rguments for a change of law are not required to be specifically so identified, [but] a contention that is so identified should be viewed with greater tolerance under the rule."), they fail to do so at the risk that a court may be unable to supply one *sua sponte.* Here we can conceive of no nonfrivolous argument for a change in the law to save Gurary's claim based on the second purchase, and the district court was unable to make such an argument in its decision refusing to award sanctions. Accordingly, we must conclude that no nonfrivolous argument for the modification or extension of law can be made to save Gurary's claim, and that sanctions therefore were mandatory.

In accordance with the foregoing, Gurary's claim arising out of his first two purchases violated Rule 11(b)(2), and therefore sanctions are mandated pursuant to the PSLRA.[7] Nevertheless, Gurary asserts that *Simon DeBartolo Group, L.P.,* stands for the proposition "that where a complaint was dismissed but its merits were nevertheless arguable, sanctions under the PSLRA are *not* warranted." However, Gurary misconstrues our holding in *Simon DeBartolo Group, L.P.* In that case, we reversed the district court's determination that plaintiff DeBartolo's 10b–5 cause of action was frivolous "[b]ecause there were non-frivolous allegations and arguments supporting each element of [DeBartolo's] Rule 10b–5 cause of action and [because] DeBartolo arguably had standing [based on existing case law] to assert [its] claim." 186 F.3d at 174.

As a consequence, we are constrained to conclude that the denial of sanctions pertaining to the claims arising out of Gurary's first two purchases constituted a material error of law. *See Simon DeBartolo Group, L.P.,* 186 F.3d at 167. We therefore remand for the district court to determine appropriate sanctions pursuant to 15 U.S.C. § 78u–4(c)(3)(A)–(C).[8]

**B. The Second Two Purchases: December 24, 1996 and February 18, 1997**

■ Nu–Tech urges that sanctions also must be imposed with respect to the claims based on the second two purchases because these claims too lack factual or legal support. In support of its argument, Nu–Tech points to our previous findings that "any allegation of reliance was 'fundamentally flawed' ... because 'there is no suggestion in the complaint or Gurary's affidavit that Feigenbaum did not intend to do just what he promised.'" Gurary argues in opposition that his intent to plead scienter "could fairly have been gleaned from the gist of [his] complaint" and that he simply failed to satisfy a "pleading technicality," making sanctions unwarranted. Gurary's contention that he merely failed to comply with a "technicality" is something of an exaggeration. Gurary did not press his current theory in his complaint or affidavits filed before the district court. It was not until he appealed the dismissal that he began to argue that he relied on Feigenbaum's assurances in making the final two purchases. *See Gurary,* 190 F.3d at 44. In any event, the district court determined that sanctions were inappropriate with respect to these later two purchases because "in reliance on Feig-

7. Gurary asserts that "[i]f sanctions were for any reason to be imposed in this case, they should be diminished" because we have concluded generally that when some of a plaintiff's claims are deemed frivolous in violation of Rule 11 but others are not, the amount of sanctions should be reduced accordingly. *See, e.g., Simon DeBartolo Group, L.P.,* 186 F.3d at 177–78. However, that issue is not before us and we do not address that issue in view of our decision to remand.

8. We note here that because we find that these two claims violate Rule 11(b)(2), sanctions should only be imposed against Gurary's counsel and not Gurary himself. *See* Fed. R.Civ.P. 11(c)(2)(A) (prohibiting an award of monetary sanctions "against a represented party for a violation of subdivision 11(b)(2)").

enbaum's promise to prevent further manipulation and stabilize the price, [Gurary] made two further purchases on which (the promises proving worthless) he suffered even more losses." *Gurary*, 2000 WL 20706, at \*1. While we disagree with the district court's reasoning and Gurary's position on appeal, we agree that sanctions are not appropriate with respect to Gurary's second two purchases.

It is well-settled that "[t]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract" and does not justify a Rule 10b–5 action. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993). Such a promise does not constitute fraud pursuant to 10b 5 "unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." *Id.* We recognize that "there [was] no suggestion in the complaint or in Gurary's affidavit that Feigenbaum did not intend to do just what he promised at the times he made the [promissory] statements," *Gurary*, 190 F.3d at 44, and that Gurary therefore failed to adequately plead the requisite reliance on false statements made by Feigenbaum with scienter. *See, e.g., Ganino v. Citizens Util. Co.*, 228 F.3d 154, 161 (2d Cir.2000) ("[P]laintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that plaintiff's reliance on the defendant's action caused [his] injury."); *see also* 17 C.F.R. § 240.10b–5. However, it does not necessarily follow that such a deficient pleading mandates a finding that Rule 11 has been violated.

David Jaroslawicz, Gurary's counsel, in an affidavit in opposition to Nu–Tech's motion to dismiss, requested leave to amend the complaint to comply with securities laws' pleading requirements in the event the district court decided to dismiss his claim for any reason. However, the district court never addressed Gurary's request to amend his complaint (nor did this

Court on the previous appeal) and therefore implicitly denied it.

A district court has broad discretion in determining whether to grant leave to amend, and we review such determinations for abuse of discretion. *See, e.g., Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 333 (2d Cir.2000) ("Leave to amend shall be freely given, and this court reviews the district court's actions for abuse of discretion."); *see also Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 283 (2d Cir.2000) ("We review the district court's decision to grant a party leave to amend for abuse of discretion."). While the district court did not abuse its discretion by implicitly denying Gurary leave to amend his complaint to cure the deficiency, *see, e.g., Confederate Mem'l Assoc. v. Hines*, 995 F.2d 295, 299 (D.C.Cir.1993) (holding that the district court did not abuse its discretion by denying leave to amend where plaintiffs made only a "bare request"), it would also not have been an abuse of that court's discretion to allow the requested leave to amend. *See McLaughlin v. Anderson*, 962 F.2d 187, 195 (2d Cir.1992) (stating that "lack of a formal motion is not [a] sufficient ground for a district court's dismissal without leave to amend, so long as the plaintiff has made its willingness to amend clear"); *see also Oliver Schs., Inc. v. Foley*, 930 F.2d 248, 252–53 (2d Cir.1991) (noting that leave to amend should be granted even without an explicit motion where the adverse party had knowledge of desire to amend). Because we do not believe that the PSLRA was designed to mandate sanctions in all cases for a complaint that, if properly pleaded, could state a cognizable claim under the securities laws, we examine Gurary's case to determine whether an amendment could have stated such a claim.

Had Gurary been afforded the opportunity to amend his complaint to allege Feigenbaum's misrepresentations with proper specificity, as he apparently sought to do, Gurary could have asserted a cognizable claim under Rule 10b–5 with respect to his

second two purchases. *See, e.g., Polar Molecular Corp.*, 12 F.3d at 1176. Gurary certainly had some basis for believing that evidence was available to demonstrate that Feigenbaum was making, with scienter, false representations regarding future events *viz.*, that he was able to, and would, head off the short sales being made by the Winehouse group. It simply cannot be said at such an early stage in the proceedings that Gurary's claims based on the second two purchases would have completely lacked evidentiary support because Gurary was never afforded the opportunity to pursue discovery. Federal Rule of Civil Procedure 11(b)(3) specifically provides that the rule is not violated if the "allegations and other factual contentions have evidentiary support or, *if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.*" Fed. R.Civ.P. 11(b)(3) (emphasis added). Accordingly, Gurary, after amending his complaint and through further investigation and discovery, could have developed some factual support that Feigenbaum "secretly intended not to perform or knew that he could not perform" the promises he made to Gurary. *See, e.g., Polar Molecular Corp.*, 12 F.3d at 1176.

Although Gurary's claim may not have survived summary judgment even with further discovery because of the inherent difficulty in establishing the subjective intent of Feigenbaum, we conclude that Gurary's failure to sufficiently plead the necessary elements of a cognizable 10b–5 claim does not warrant sanctions under the PSLRA in this instance because the district court could have, within its broad discretion, afforded Gurary leave to amend his complaint, which would have resulted in a cognizable 10b–5 claim.

## CONCLUSION

In accordance with the foregoing, the order of the district is affirmed on other grounds in part, and vacated and remanded in part for further determinations consistent with this opinion.