**Louis S. CAIOLA, Plaintiff,**

v.

**CITIBANK, N.A., Defendant.**

**No. 00 Civ. 5439(DLC).**

United States District Court,
S.D. New York.

April 2, 2001.

David Boies, Philip C. Korologos, Eric Brenner, Boies, Schiller & Flexner LLP, Armonk, NY, for Plaintiff.

Rory O. Millson, Cravath, Swaine & Moore, New York City, for Defendant.

*OPINION AND ORDER*

COTE, District Judge.

This motion addresses whether synthetic trading of stocks and options was governed by the federal securities laws prior to their amendment in December 2000. Defendant Citibank, N.A. ("Citibank") has moved to

dismiss the complaint in this securities fraud action on the ground, among others, that the transactions at issue did not constitute trading in securities. For the reasons that follow, Citibank's motion to dismiss is granted.

**BACKGROUND**

The complaint and the documents integral to it reflect the following. Plaintiff Louis Caiola ("Caiola") has been a client of Citibank for sixteen years. Beginning in 1986, Citibank began arranging trades for Caiola with the same brokerage houses that it used to enter into trades for itself. Through an arrangement with Citibank and these brokerage houses, Caiola placed equity trades and hedged his positions in the options market.

In 1994, Citibank proposed to Caiola an investment strategy involving the "synthetic" trading of stocks and options. A synthetic transaction is a contractual agreement between an investor and a counterparty, often a bank, that gives the investor the economic equivalent of a position in a certain security without the investor actually buying that security. The contractual or synthetic positions taken by the investor are pegged to the economic value that the actual stock or option has in the securities markets, but the investor does not buy or sell any security. According to Citibank's representations to Caiola, synthetic trading permits an investor to approximate large positions in securities without having to meet margin requirements, risk affecting a stock's value by making a large trade, risk not being able to find a seller or buyer when trying to establish or unwind a large position, or pay for or receive actual stock. Pursuant to their contract, each party is a principal in the transaction, and neither acts as the other's agent.

On March 25, 1994, Citibank and Caiola signed the standard form contract that would govern the synthetic transactions, called an International Swap Dealers Association Master Agreement ("ISDA Agreement"). A Schedule to the ISDA Agreement provides, among other things, that Caiola understands that Citibank "has no obligation or intention to register any Transactions under the Securities Act of 1933, as amended, or any state securities law or other applicable federal securities law." Each synthetic transaction was also confirmed in writing. In a confirmation which is representative of the confirmations used in connection with the synthetic trading ("Confirmation"), Caiola acknowledged that he was not relying on any advice from Citibank, that he had the independent ability to evaluate the transaction and its risks, that Citibank was not his fiduciary, and that the transaction would not be registered under the securities laws. It states:

9. Representations

(a) In connection with this Confirmation, the Transaction to which this Confirmation relates and any other documentation relating to the [ISDA] Agreement, each party to this Confirmation represents and acknowledges to the other party that:

(i) It is not relying on any advice, statements or recommendations (whether written or oral) of the other party regarding such Transaction, other than the written representations expressly made by that other party in the Agreement and in this Confirmation in respect of such Transaction;

(ii) it has the capacity to evaluate (internally or through independent professional advice) such Transaction (including decisions regarding the appropriateness or suitability of such Transaction) and has made its

own decision to enter into such Transaction;

(iii) it understands the terms, conditions and risks of such Transaction and is willing to accept those terms and conditions and to assume (financially and otherwise) those risks;

(iv) it is entering into such Transaction, as principal and not as an agent for any other party;

(v) it acknowledges and agrees that the other party is not acting as a fiduciary or advisor to it in connection with this Transaction;

....

(b) [Caiola] represents to [Citibank] that ...

(iii) it understands that [Citibank] has no obligation or intention to register this Transaction under the Securities Act of 1933, as amended, or any state securities law or other applicable federal securities law;

....

(v) IT UNDERSTANDS THAT THE TRANSACTION CONTEMPLATED HEREUNDER IS SUBJECT TO COMPLEX RISKS WHICH MAY ARISE WITHOUT WARNING AND MAY AT TIMES BE VOLATILE AND THAT LOSSES MAY OCCUR QUICKLY AND IN UNANTICIPATED MAGNITUDE AND IS WILLING TO ACCEPT SUCH TERMS AND CONDITIONS AND ASSUME (FINANCIALLY AND OTHERWISE) SUCH RISKS.

(Emphasis in original.) Nevertheless, Caiola asserts that Citibank assured Caiola that, despite the language in the Confirmation, Citibank's "fiduciary umbrella" continued to operate "at the cornerstone of the synthetic trading relationship (apart from Mr. Caiola's individual investment decisions) between Citibank and Mr. Caiola."

After entering into the ISDA Agreement, Caiola, an expert in Philip Morris' stock, designed and established synthetic positions in Philip Morris stock and options. These positions grew to be enormous and had "notional" values of as much as $350 million.

Citibank made money from this contractual arrangement by charging Caiola interest on the "loan" that represented the notional value in Caiola's positions and premiums for any synthetic options he chose to include in the arrangement. In addition, each party stood to make or lose money depending on whether Caiola's investment strategies turned out to be correct.[1]

Each party was responsible for managing its own risk. Caiola frequently managed his risk by hedging, that is, by combining synthetic stock and options or offsetting options strategies. Indeed, in Caiola's view, synthetic trading meant

---

1. The following example illustrates the synthetic trading principles described in the complaint. If Philip Morris stock were trading on the New York Stock Exchange for, say, $50 per share, rather than purchase 100 shares of Philip Morris, Caiola might enter into a contract with Citibank to approximate such a position. Rather than Caiola paying Citibank the $5000 purchase price of the stock, Citibank would treat it as a $5000 loan to Caiola, for which Caiola would pay interest. Under this contract, Citibank would pay Caiola the amount of any gains on his synthetic position; Caiola would pay Citibank the amount of any losses. For example, if on a certain date Philip Morris stock had risen to $55 per share, Citibank would pay him $500, representing the five-dollar-per-share gain on his 100–share synthetic position. If on that date, however, Philip Morris stock had fallen to $45 per share, Caiola would pay his counter party $500. Finally, Citibank would pay Caiola the amount of any dividends he would have received if he had owned the 100 shares.

that he could pursue his investment strategies while ensuring that any risk was always quantifiable and controllable. Citibank informed Caiola that it would hedge its own risk by making investments for itself in the securities markets through a strategy called "delta hedging," based upon the ratio by which a derivative instrument (say, an option) trades relative to an underlying asset (say, a stock). For each transaction made by Caiola, Citibank informed Caiola that it would manage its investments to achieve "delta neutrality," a hedge position by which Citibank would off-set its obligations to Caiola in the event Caiola's trading strategy required Citibank to pay Caiola. Citibank informed Caiola that it would need to invest in only a fraction of the securities reflected in the synthetic trading in order to achieve delta neutrality. Citibank also represented that it would perpetually monitor Caiola's investments in order to maintain delta neutrality.

By 1998, the volume of Caiola's synthetic trading in Philip Morris options was approximately equal to one-quarter of the worldwide volume of physical trading in Philip Morris options. By the Fall of 1998, Caiola had taken synthetic positions that were almost fully hedged so that he stood to lose at most approximately $2 million of the roughly $40 million he had then invested through synthetic trading.

In October 1998, Citibank's parent company merged with Travelers Group, Inc. ("Travelers"), and Travelers' investment banking and brokerage unit, Salomon Smith Barney ("Salomon") assumed certain Citibank functions. At a November 18, 1998 meeting, Citibank informed Caiola that Salomon would become involved in handling Caiola's synthetic trades. Citibank assured Caiola, however, that Citibank would oversee his synthetic trading

relationship on exactly the same basis as it had prior to the merger, and that Caiola could continue his investment strategy. In reliance on Citibank's representations, Caiola entered into new, speculative positions from November 30, 1998 to March 1999, that exposed his portfolio to substantial risk, including positions that did not expire until the year 2000.

Plaintiff asserts that, between November 1998 and March 1999, Citibank decided to hedge its risk from Caiola's trading not by "delta hedging" but by buying on the securities exchanges the very securities in which Caiola invested synthetically. Caiola contends that Citibank's secret hedging strategy robbed him of one of the chief benefits of synthetic trading since the market now felt the full impact of his strategies. Specifically, Citibank executed trades in millions of Philip Morris puts, which had the effect of depressing the price of Philip Morris stock. While these trades corresponded to the synthetic positions Caiola had taken, Caiola had not authorized them and they were done without his knowledge. Caiola alleges that Citibank had executed trades in Philip Morris securities that replicated Caiola's synthetic trading even before the merger with Travelers, that is, in March 1998. Then, in March 1989, Citibank advised Caiola that it would no longer engage in synthetic trading. As a consequence, Caiola was unable to reduce the risk to which his recent trading had exposed him. Caiola asserts that Citibank's pressure on the Philip Morris stock price through its substantial options trading, coupled with its refusal to allow Caiola to continue synthetic trading and thereby hedge his losses, caused him to suffer losses in the tens of millions of dollars.

In his complaint, Caiola has brought six causes of action against Citibank, three of which assert that Citibank violated Section

10(b) of the Exchange Act of 1934 and Rule 10b–5 through: (1) misrepresentations and omissions; (2) unauthorized trades; and (3) unsuitable trades. Plaintiff also asserts state law claims of (4) fraud; (5) breach of fiduciary duty; and (6) breach of contract. Plaintiff seeks $40 million, rescission of all transactions entered into after November 18, 1998, and punitive and other damages.

Citibank has moved to dismiss, asserting that Caiola has failed to state a claim under Section 10(b) or Rule 10b–5 because: (1) Caiola did not purchase "securities" as defined by federal law; (2) Caiola has inadequately pled that Citibank made material false representations or omissions; and (3) Caiola has inadequately pled injury as a result of Citibank's alleged misrepresentations or omissions. Citibank also asserts that Caiola has failed to state a claim for breach of contract, breach of fiduciary duty, or fraud.

## DISCUSSION

A court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief.' " *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the motion, the court must take "as true the facts alleged in the complaint and draw[ ] all reasonable inferences in the plaintiff's favor." *Jackson Nat. Life Ins. v. Merrill Lynch & Co.,* 32 F.3d 697, 699–700 (2d Cir.1994). The court can dismiss the claim only if, assuming all facts alleged to be true, the plaintiff still fails to plead the basic elements of a cause of action. The court may also consider the ISDA Agreement and the Confirmation under which the parties entered into the swap transactions, because plaintiff has no-

tice of both documents and they are integral to his claims. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000).

At all times relevant to this case, Section 10(b) of the Exchange Act provided that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Pursuant to its rule-making authority, the Securities and Exchange Commission adopted Rule 10b–5, which "makes it unlawful, in connection with the purchase or sale of any security, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Grace v. Rosenstock,* 228 F.3d 40, 46 (2d Cir.2000) (citing 17 C.F.R. § 240.10b–5(b)). To state a claim under Section 10–b and Rule 10b–5, a plaintiff must plead that "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir. 2000).

### A. *Purchase or Sale of Securities*

In order to have standing to sue for damages under Rule 10b–5, a plaintiff

**368**

must be a purchaser or seller of securities. *Gurary v. Winehouse,* 190 F.3d 37, 46 n. 9 (2d Cir.1999); *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.,* 186 F.3d 157, 170 (2d Cir.1999). The Exchange Act defines "security" in relevant part as

> any note, stock, treasury stock, bond, debenture, ... investment contract, ... any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof) ... or, in general, any instrument commonly known as a security.

15 U.S.C. § 78c(a)(10).

The definition of security is "flexible" in order to "meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). As the Supreme Court has noted, the definition "permit[s] the SEC and the courts sufficient flexibility to ensure that those who market investments are not able to escape the coverage of the Securities Acts by creating new instruments that would not be covered by a more determinate definition." *Reves v. Ernst & Young,* 494 U.S. 56, 63 n. 2, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). Indeed, when faced with "unusual instruments not easily characterized as 'securities,'" it is appropriate to consider whether "the economic reality underlying the transactions indicated that the instruments were actually of a type that falls within the usual concept of a security." *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 690, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). The Supreme Court has cautioned, however, that in creating the federal securities laws, Congress "did not intend to provide a broad federal remedy for all fraud." *Marine Bank v. Weav-* *er,* 455 U.S. 551, 557, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982).

**1. Physical Securities**

Caiola has not alleged that he *himself* purchased a security. Instead, he asserts that Citibank, acting improperly as his "broker-agent" and without his knowledge or consent, replicated his synthetic swaps on the physical market *for Caiola's account.*

Under traditional agency principles, "the authority of an agent is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him." *Minskoff v. Am. Exp. Travel Svcs.,* 98 F.3d 703, 708 (2d Cir.1996) (citation omitted) (applying agency principles to federal Truth in Lending Act). This authority "exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act." *Id.*

Caiola has not alleged that he consented to have Citibank act as his agent in purchasing or selling securities, nor does Caiola assert that Citibank could reasonably have inferred that it had such authority. Rather, Caiola asserts that Citibank's actions had the effect of unilaterally establishing itself as Caiola's agent. These assertions are insufficient to create an agency relationship. Moreover, Caiola has not alleged that he was bound by Citibank's securities trading. He has not pleaded that he was required to post margin or to settle the Citibank investments. To the contrary, plaintiff asserts that when Citibank sought physical settlement from Caiola based on Caiola's own synthetic trading, Caiola protested and Citibank conceded that Caiola's trading was for

cash settlement only, and did not involve the trading of actual securities. Because Citibank did not act as Caiola's agent, Citibank's purchases and sales of securities did not make Caiola a purchaser or seller of securities.

## 2. Synthetic Securities

Caiola argues, in the alternative, that the synthetic transactions into which he entered with Citibank constitute trading in "securities." Caiola never affirmatively argues that the synthetic transactions at issue here fall under *any* of the definitions of a security contained in Section 78c(a)(10). He does, however, take issue with Citibank's argument, in its motion to dismiss, that these transactions are not investment contracts, instruments commonly known as securities, notes, evidence of indebtedness, or options on securities. Apparently, no court has addressed whether the types of transactions at issue in this case constitute securities, although in *Procter & Gamble Co. v. Bankers Trust Co.*, 925 F.Supp. 1270 (S.D.Ohio 1996), the court held that certain interest rate swap contracts were not "securities." For many of the same reasons offered in *Procter and Gamble*, the transactions at issue here are not securities.

### Investment Contracts or Instruments Commonly Known as Securities

■ An investment contract is defined as "any 'contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party.'" *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir.1994) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244

(1946)). There must, therefore, be "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Id.* A "common enterprise" can be established through a showing of " 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Id.* A finding of horizontal commonality "requires a pooling or sharing of funds." *Id.* (citation omitted).[2] This same standard has been used to determine whether a transaction qualifies as an "instrument commonly known as a security." *United Housing Found. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

Caiola argues that his synthetic trading with Citibank did involve a common enterprise because Citibank hedged its own risks by trading securities and that the existence of buyers and sellers on the opposite side of Citibank's securities trades is sufficient to establish "horizontal commonality." There was, however, no "sharing or pooling of funds" between Caiola and those other investors in the securities markets that would establish horizontal commonality. *Revak*, 18 F.3d at 87. As the *Procter and Gamble* court discussed, there is no common enterprise if the investor "did not pool its money with that of any other company or person in a single business venture," and the way in which Citibank hedged its own position is immaterial. *Procter and Gamble*, 925 F.Supp. at 1278.

In sum, the transactions at issue in this case are not investment contracts or instruments commonly known as securities.

---

**2.** The Second Circuit has not decided whether a common enterprise can also be established through strict vertical commonality, which requires that the fortunes of the investors be

tied to the fortune of the promoter. *Revak*, 18 F.3d at 87–88. Regardless, Caiola does not argue that there was any kind of vertical commonality between himself and Citibank.

**370**

Based on Caiola's description of the synthetic trading, Caiola has not alleged that he pooled his money with other investors or that there was any common enterprise between Caiola and those investors in the securities markets who sold securities to or bought securities from Citibank.

### Family Resemblance to Notes, or Evidence of Indebtedness

█ A note is generally understood as a written promise to pay a specified sum of principal and interest to a payee at a certain time. *Procter and Gamble*, 925 F.Supp. at 1278; *Sanderson v. Roethenmund*, 682 F.Supp. 205, 206 (S.D.N.Y. 1988). Caiola has not alleged that the synthetic transactions at issue are notes. Nor has Caiola alleged that the synthetic transactions are evidence of indebtedness. Although Caiola has alleged that he made payments to Citibank that equaled the amount of interest that would be paid on a loan equal to the notional amount of the transactions, no principal was ever loaned or repaid, and the "loan" arrangement is not in any event the arrangement which Caiola contends is a security covered by the federal securities laws. Accordingly, it is unnecessary to consider whether the synthetic transactions between Caiola and Citibank fall within the "family resemblance" test described in *Reves v. Ernst & Young*, 494 U.S. 56, 65–67, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), by which courts decide whether notes or evidence of indebtedness are "securities" for the purposes of the federal securities laws.

### Options on Securities

█ Finally, Citibank asserts that the synthetic trading transactions are not "options on securities." An option contract "entitles a purchaser to buy or sell a commodity by some specified date at a fixed price, known as the 'strike' price, determined by the market value of the commodity at the time the option is purchased." *United States v. Bein*, 728 F.2d 107, 111 (2d Cir.1984) (citation omitted). The synthetic transactions between Caiola and Citibank were not options on securities since "they did not give either counterparty the right to exercise an option or to take possession of any security." *Procter and Gamble*, 925 F.Supp. at 1282.

Caiola relies heavily on the fact that the SEC has recognized some swap transactions as securities protected by federal securities law where the value of the transaction was based on the value of securities. The SEC has taken this position, both before and after *Procter and Gamble* was decided. In *In the Matter of BT Securities Corporation*, Nos. 33–7124, 34–35136, 1994 WL 710743, at * 4–5, n. 6, n. 7 (Dec. 22, 1994), the SEC concluded that a Treasury–Linked Swap and a Knock–Out Call Option, which it characterized as cash-settled put and call options, respectively, were securities under the federal securities laws. The SEC reached this decision while acknowledging that the transactions were specialized and not traded publicly in any market. *Id.* at *2. *Procter and Gamble* considered and then rejected the SEC's conclusion in *BT Securities*, both because the opinion was rendered in the course of a settlement with the explicit statement that it had no precedential value, and because the courts must construe the federal securities laws. *Procter and Gamble*, 925 F.Supp. at 1281. The SEC noted its disagreement with *Procter and Gamble's* conclusion in a 1996 settlement release in which it reiterated its position that a treasury-linked swap is a security within the meaning of federal securities law because it is "a cash-settled put option in which payment is based on the spread between the price and yield of two different Treasury securities." *In the Matter of Gary S.*

*Missner,* Release Nos. 33–7304, 34–37301, 1996 WL 316296, at *4 n. 4 (June 11, 1996).

New legislation, the Commodity Futures Modernization Act ("CFMA"), signed into law on December 21, 2000, indicates, however, that options based on the value of a security do not constitute "securities." Section III of the CFMA, entitled "Legal Certainty for Swap Agreements," distinguishes between two types of swap agreements—"non-security-based swap agreements" and "security-based swap agreements"—and defines the latter as a type of "swap agreement . . . of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein." CFMA, Title III § 301. The CFMA specifically excludes both types of swap agreements from the definition of securities. *Id.* at § 302. For instance, under the CFMA, "the definition of 'security' . . . does not include any security-based swap agreement," and the SEC is prohibited from "registering" or issuing rules or orders that could act "as prophylactic measures against fraud, manipulation, or insider trading" with respect to any "security-based swap agreement." CFMA, Title III § 303. On the other hand, the CFMA amends Section 10(b) to prohibit "any manipulative or deceptive device or contrivance" "in connection with

the purchase or sale of any . . . security-based swap agreement." [3] Thus, while it is beyond dispute that, under the amended securities law, the transactions at issue in this case would not be "securities," the amended Section 10(b) would indisputably cover the transactions at issue in this case.

The legislative history of the CFMA concerning security-based swap agreements is sparse, but confirms that the authority to pursue fraud in connection with security-based swaps did not exist prior to the CFMA. Senator Gramm, one of the senators who introduced the Senate bill, characterized the SEC's "authority to undertake certain enforcement actions in connection with security-based swap agreements" under the CFMA as "new," and Senator Lugar also indicated that the SEC's authority over institutional swaps for fraud did not exist prior to the CFMA. *See* 146 Cong. Rec. S. at 11867, 11925 (daily ed. Dec. 15, 2000) (statement of Senator Gramm). Plaintiff points to two statements by the Treasury Secretary and the Chairman of the SEC in Senate Committee hearings regarding the CFMA in support of his assertion that security-based swap agreements were "securities" under Section 10(b) prior to its amendment. Neither statement specifically addresses private agreements like the one at

---

**3.** The CFMA also includes a "Savings Provision" that provides that "[n]othing in this Act . . . shall be construed as a finding or implying that any swap agreement is or is not a security for any purpose under the securities laws." CFMA, Title III, § 304. The Savings Provision does not affect the way in which swap agreements should be understood either before or after the passage of the CFMA. Savings clauses are understood to "preserve something from immediate interference—not to create; and the rule is that expression by the Legislature of an erroneous opinion concerning the law does not alter it." *Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 162, 40 S.Ct. 438, 64 L.Ed. 834 (1920). Accord-

ingly, the Savings Provision does not create law that controls the outcome of this case. In addition, the Savings Provision should not be read to contradict or invalidate other portions of the CFMA. With regard to a provision in a different act, the Supreme Court held that a savings clause "saves only those rights and remedies that are 'not inconsistent with the rules and regulations prescribed by the provisions of this act. . . . [T]he act cannot be said to destroy itself.'" *Cleveland v. Beltman North American Co., Inc.,* 30 F.3d 373, 379 (2d Cir.1994) (quoting *Adams Exp. Co. v. Croninger,* 226 U.S. 491, 507, 33 S.Ct. 148, 57 L.Ed. 314 (1913)).

issue here and, indeed, one statement acknowledges that swaps were not and—under the new statute will not—be defined as "securities." [4]

Although the synthetic transactions at issue in this case would indisputably be protected under the CFMA if they were issued after December 21, 2000, these transactions are not now defined as securities and were not protected by federal securities law before the CFMA was passed into law. Accordingly, because these synthetic transactions do not fit under any definition of "security," plaintiff's claims must be dismissed.

## B. *Material Misrepresentation*

■ Citibank additionally asserts that plaintiff's claims should be dismissed because Caiola has not alleged that Citibank made any material misrepresentations. To state a claim under Section 10(b), a complaint must allege that a defendant made a "materially false statement or omitted a material fact." *Ganino*, 228 F.3d at 161. The materiality requirement is satisfied by allegations that the statement or omission is one "that a reasonable investor would have considered significant in making investment decisions." *Id.* A complaint may not be dismissed for failure to allege materiality unless the statements or omissions are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at 162 (citation omitted). Securities fraud claims are,

however, subject to the requirements of Rule 9(b), Fed.R.Civ.P., which requires that "the circumstances constituting fraud shall be stated with particularity." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000) (citation omitted).

In his complaint, Caiola attributes several misrepresentations to Citibank that contradict unambiguous language in the ISDA Agreement and the Confirmation. Caiola asserts that Citibank misrepresented in November 1998, that "its synthetic trading relationship would not change" when, in fact, it "intended to begin replicating Mr. Caiola's positions through transactions in physical securities on the physical market." In the Confirmation, however, Citibank and Caiola agreed that they were "not relying on any advice, statements or recommendations (whether written or oral) of the other party" regarding the transaction. According to the terms of the ISDA Agreement and the Confirmation, Citibank was under no obligation to advise Caiola about its investment strategy or hedge Caiola's investments in a particular way. Because the oral misrepresentations allegedly made by Citibank directly conflict with unambiguous language in the Confirmation, the language in the Confirmation controls and the misrepresentations alleged in the complaint can be disregarded. *See Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d Cir.1996); *Steinberg v. PRT Group, Inc.*, 88 F.Supp.2d 294, 300 (S.D.N.Y.2000) (collecting cases); *Hiner-*

---

4. *See Commodity Futures Modernization Act of 2000: June 21, 2000 Hearing on S. 2697 Before the Sen. Comm. on Agriculture, Nutrition and Forestry and the Sen. Comm. on Banking, Housing, and Urban Affairs*, 106th Cong. (2000) (statement of Lawrence H. Summers, Treasury Secretary) ("we do not believe that swaps should be regulated as securities. However, it is important to preserve prohibitions against insider trading, fraud, and manipulation and also to preserve other mea-

sures which are demonstrably necessary to protect retail customers"). *See also id.* (statement of Chairman Arthur Levitt, United States Securities and Exchange Commission) ("[u]nder [well-established tests of what is a security] it has been recognized from the earliest days of the securities laws that *over-the-counter options* on securities were themselves securities, even if documented as swaps") (emphasis supplied).

*feld v. United Auto Group*, No. 97 CIV. 3533(RPP), 1998 WL 397852, at *4 (S.D.N.Y. July 15, 1998) (same).

Caiola also asserts that Citibank misrepresented that it would act as his fiduciary. The Confirmation explicitly states, however, that Citibank would *not* act as his fiduciary. For the same reasons stated above, parol evidence is inadmissible as a matter of law to contradict the terms of an unambiguous agreement. Moreover, even if Citibank *had* misrepresented that it would act as Caiola's fiduciary, this allegation would be insufficient to survive a motion to dismiss because a material misrepresentation must involve more than "a generalized promise to act as a faithful fiduciary." *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986).

Caiola additionally alleges that Citibank misrepresented the reasoning behind its decision to exercise an option early and to refuse to engage in additional transactions. Caiola does not dispute, however, that Citibank had the contractual right to take these actions, and the reasoning behind Citibank's decision to take these actions would not reasonably affect an investor's decisionmaking. Finally, Caiola asserts that Citibank made several misrepresentations stemming from its unauthorized purchases of securities in the physical market for Caiola. As described above, Citibank could not have acted as Caiola's agent without his consent and, therefore, could not have subjected him to the risks and harms that Caiola alleges. Accordingly, Caiola has not pled that Citibank made any material misrepresentations and has, therefore, failed to establish a prima facie case under Section 10(b).

Citibank additionally asserts that Caiola has not adequately pled injury. Because this Court finds that the transactions at issue are not securities and that in any event Caiola has not pled that Citibank made any material misrepresentations, it is unnecessary to consider the parties' arguments regarding injury.

## C. *Sanctions*

■ Under the Private Securities Litigation Reform Act of 1995, a district court is required, at the conclusion of a case, to "make specific findings as to a party's compliance with Federal Rule of Civil Procedure 11(b)" and *"mandates* the imposition of sanctions if the court determines that Rule 11 has been violated." *Gurary v. Winehouse*, 235 F.3d 792, 797 (2d Cir. 2000) (emphasis in original). Rule 11(b) provides, in relevant part, that

> By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

Fed.R.Civ.P. 11(b). Rule 11 is violated when "it is clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Gurary*, 235 F.3d at 798 (citation omitted). As the 1993 Advisory Committee Notes explain, "the extent to which a litigant has researched the issues and found some support for its theories even in minority opinions, in law review articles, or through consultation with other attorneys should certainly be taken into account in determining whether [Rule 11] has been violated." *Id.* at 797–98 (citation omitted).

**374**

Caiola's complaint was not frivolous, and there was some support for his assertions in law review articles and other sources. Accordingly, Caiola did not violate Rule 11 and sanctions are inappropriate.

## CONCLUSION

For the reasons stated, Citibank's motion to dismiss Caiola's claims under the federal securities laws is granted. Because plaintiff's federal claims are dismissed, the Court declines to exercise supplemental jurisdictions over his state law claims.

SO ORDERED: